DON LARSON, also known as DONALD LARSON and DONALD LARSEN, appellant, v. FIREMAN'S FUND INSURANCE COMPANY, appellee.

No. 51843.

(Reported in 139 N.W.2d 174)

December 14, 1965.

Larson & Carr, of Charles City, for appellant.

Westfall, Laird & Burington, of Mason City, for appellee.

Moore, J.—In this action plaintiff seeks to recover the value of 2066 turkeys under an insurance policy on the theory their death by suffocation was caused through malicious mischief as a result of an unidentified airplane flying over the turkeys at 150 to 200 feet. At the close of the evidence the trial court directed a verdict for defendant on a finding the evidence was insufficient to raise a jury question on malicious mischief and proximate cause. Plaintiff has appealed from judgment on the verdict. We hold the evidence regarding malicious mischief is insufficient.

Plaintiff assigns two errors. He asserts the trial court erred in finding the evidence insufficient to create a jury question of (1) malicious mischief on the part of the pilot and (2) proximate cause.

At the close of plaintiff's evidence defendant rested and then made its motion for directed verdict which was sustained. It is therefore our duty to give plaintiff's evidence the most

favorable construction it will reasonably bear. Citation of authority is unnecessary. See rule 344(f)2, Rules of Civil Procedure.

Plaintiff, a farmer, lived three quarters of a mile west of Coulter where he had raised and marketed about 9500 turkeys a year for fifteen years.

On March 11, 1964, plaintiff purchased 4335 poults and on that day obtained from defendant insurance company a "turkey floater policy". It insured against death of the turkeys from various causes. Issuance of the policy and payment of premium are admitted. The material parts of the policy are:

"INSURED AGAINST LOSS BY DEATH: * * * (A) Directly resulting from: ('a) Fire, Lightning, Explosion, Smoke, Vandalism and Malicious Mischief; * * * (B) Caused by huddling, piling, smothering, drowning, or freezing ONLY: (a) As the immediate and direct result of one of the above mentioned perils insured against coming in contact with the turkeys, or (b) If one of the perils mentioned (exclusive of collision, upset or overturning) causes damage to or on the premises of the Assured, * * *."

From date of purchase to July 21, 1964, there was a loss of 437 turkeys from various causes, not connected with this case.

On July 21, 1964, a hot day with the temperature around 96, plaintiff, his wife, Dale Nielsen and Kenneth Janssen were baling straw about 60 rods northwest of plaintiff's 12 turkey shelters and two water wagons where turkeys of various ages and size, including those insured by defendant, were being kept. At approximately five o'clock that afternoon the three men observed a gray single engine airplane flying about straight south as it passed just west of the enclosure where the insured turkeys were kept. Plaintiff's wife had apparently temporarily left the job. Each estimated the height of the plane at 150 to 200 feet above the ground during the short time they observed it. Plaintiff testified he watched it travel about 30 rods. All stated it remained at the same height and they observed nothing unusual about its flight except the altitude. The pilot was not identified. They testified they could see only a pen of young smaller turkeys and saw them run for cover when the plane went over. No in-

jury or damage to these smaller birds was caused. They averaged approximately ten pounds. The men continued their work and gave no particular attention to the turkeys. Plaintiff testified he did not suspect injury to any of his turkeys and that if he had he would have gone over and looked at them. He had not been to the turkey pens since seven o'clock that morning.

Plaintiff's wife did not see the plane go over at 5 p.m. She testified she saw a gray plane flying north over the turkeys at approximately 200 feet at 2 p.m. that afternoon. The farm is on the flyway between Minneapolis and Des Moines.

Plaintiff testified: "I kind of think it was the plane going south that frightened the turkeys; the one at five o'clock."

Paragraph 3 of plaintiff's petition as amended alleges: "That on the 21st day of July, 1964, at approximately five o'clock P.M., an airplane was maliciously flown—between 150 and 200 feet—above the said flock of approximately 4300 turkeys, so frightening them that they stampeded, fled for cover, piled up under the cover and two thousand sixty six (2066) turkeys suffocated."

Upon completion of their day's work the men returned to the barn and Nielsen and Janssen left.

Between 6:15 and 6:30 p.m., plaintiff and his wife went to the turkey pens where they found hundreds of dead turkeys piled tight under the shelters and around the water wagons. All were large birds averaging 23½ lbs. They were being kept in pens just east of the smaller turkeys the witnesses observed running when the plane went over at 5 p.m.

Investigation and count the next day established that 2066 large turkeys insured by defendant had died. Plaintiff fixed their value at five dollars each.

Plaintiff testified: "I then went back to the house and called our feed man (at Ames). He said the cause of death might be the heat. I didn't know the cause. I had no experience with heat at all and that's what he said, and—well, I thought possibly it was."

Subsequent further study led plaintiff to believe the turkeys died of suffocation after being frightened by the 5 p.m. low flying plane. His claim the loss was the result of malicious mischief was not recognized by defendant-company.

Robert Slaughter, an expert in handling and feeding turkeys and a recognized advisor to turkey growers, explained the characteristics and habits of turkeys. He testified turkeys are very alert to flying objects and are easily frightened. He stated: "I have had experience of birds dying because of having been frightened. The birds that die from fright will die in a pile. I mean they will get to an object and that stops them, but they just keep piling on top of one another, whether it be from flying objects or from rats or anything else, they will do the same identical thing. I have had experience of a flock that died from the fright of an airplane. That was in 1959 * * *."

I. We agree with plaintiff's statement in his brief that determination of his first assigned error "turns really on the meaning of the words malicious mischief". They are not defined in the policy.

Malice is an essential ingredient of malicious mischief both at common law and under most statutes defining the offense. 54 C. J. S., Malicious Mischief, section 3(a); 34 Am. Jur., Malicious Mischief, section 8. Malice is given the general meaning attributed to it when used in criminal statutes. 54 C. J. S., Malicious Mischief, section 3(b).

Section 714.1, Code, 1962, making malicious mischief a crime, provides that if any person willfully and maliciously destroys or injures chattels he shall be punished as provided therein and be liable to the party injured in a sum equal to three times the value of the property so destroyed or injured.

Malice is made an ingredient of malicious mischief by our statute. State v. Leslie, 138 Iowa 104, 106, 115 N.W. 897, 898, 128 Am. St. Rep. 160, and citations; State v. Waltz, 158 Iowa 191, 193, 139 N.W. 458, 459.

The established rule is that if, at the time of doing the acts charged, the accused was bent on mischief against some person, ordinarily the owner, and was prompted by an evil mind to destroy or injure the property, then malice is shown, and it is immaterial whether he knew who owned the property. State v. Leslie, 138 Iowa 104, 105, 115 N.W. 897, 898, 128 Am. St. Rep. 160, and citations; State v. Waltz, 158 Iowa 191, 195, 139 N.W. 458, 459, 460; State v. Shaffer, 202 Iowa 958, 960, 211 N.W. 230, 231.

██ We are unable to find in the record any evidence on which the jury could find the unidentified pilot was bent on mischief against the plaintiff and was prompted by an evil mind. None of the witnesses had any such reaction when they observed his conduct. He was violating section 91.79 of the Civil Aeronautics Administration Rules which provides: "Minimum safe altitudes; general. Except when necessary for takeoff or landing, no person may operate an aircraft below the following altitudes: * * * (c) Over other than congested areas. An altitude of 500 feet above the surface, except over open water or sparsely populated areas. In that case, the aircraft may not be operated closer than 500 feet to any person, vessel, vehicle, or structure."

We may assume such a violation is negligence for which one might be held in tort but it does not render him liable for treble damages under Code section 714.1.

██ Schtul v. People, 96 Colo. 217, 221, 40 P.2d 970, 972, states: " 'The mere intentional doing of an act prohibited by statute, or omitting the performance of a statutory duty, does not alone constitute malicious mischief, though it may damage the property of another.' " See also 54 C. J. S., Malicious Mischief, section 5.

In State v. Lightfoot, 107 Iowa 344, 348, 78 N.W. 41, 42, we say: "Such act, under the statute, must have been maliciously done, and to charge that the act was unlawful and willful is not equivalent to saying that it was malicious."

Plaintiff calls to our attention several cases in which recovery was allowed because of low flying planes. In Leisy v. United States, 102 F. Supp. 789, low flying Navy planes near Hackensack, Minnesota, frightened plaintiff's minks, causing the mothers to kill their kits. Recovery was allowed on the theory of negligence. In Maitland v. Twin City Aviation Corporation, 254 Wis. 541, 37 N.W.2d 74, recovery was also allowed for loss of minks caused by low flying planes in violation of the 500-foot safety standard rule. Matson v. United States, 171 F. Supp. 283, 145 Ct. Cl. 225, holds plaintiff entitled to damages from military aircraft flying below the minimum altitude. In Aaron v. United States, 311 F.2d 798, 160 Ct. Cl. 295, recovery for taking of an easement of flight was allowed as a result of jets flying in viola-

354

tion of the 500-foot safety rule. These cases do not consider malice or malicious mischief, they only support tort liability of the pilot or owner of the low flying plane. They do not support recovery here.

II. Plaintiff's reply brief makes reference to recovery based on vandalism. Such an issue was not submitted to the trial court nor is it within his assigned errors. Without deciding the issue we are not persuaded it has merit. See 91 C. J. S., Vandalism, page 802; Volume 44, Words and Phrases, Vandalism, pages 113 and 114.

III. Our holding in Division I is decisive of the appeal. Consideration of plaintiff's second assigned error is unnecessary. It involves primarily a fact question of causal connection.— Affirmed.

All JUSTICES concur.