**UNITED STATES of America, Plaintiff-Appellee,**

**v.**

**Michael Denis CULLEN, Defendant-Appellant.**

**No. 18959.**

United States Court of Appeals, Seventh Circuit.

Dec. 20, 1971.

James M. Shellow, Milwaukee, Wis., for defendant-appellant.

David J. Cannon, U. S. Atty., Milwaukee, Wis., for plaintiff-appellee.

Before FAIRCHILD, STEVENS and SPRECHER, Circuit Judges.

STEVENS, Circuit Judge.

For participating with others in the removal and destruction by burning of official records of the Selective Service System in Milwaukee, appellant was convicted of violating 18 U.S.C. § 2071 and 50 App.U.S.C. § 462(a). His principal contention is that the judge should have instructed the jury on his theory of defense; it was his theory that religious compulsion might negate the requisite criminal intent and thereby warrant acquittal. He also contends that the second offense included the first, and that the court's refusal to ask prospective jurors about their religious beliefs was error.

### I.

Appellant was given an unlimited opportunity to present evidence that was even arguably relevant either to the issues or to an understanding of his character and motivation. Several witnesses described his good works and saintly reputation. His own testimony was a two-day autobiographical narrative delivered in response to five or six general questions. The length and content of his responses were curtailed only by the midsession and noon recesses.[1]

Only fragments of appellant's testimony made any direct reference to the act of burning draft records. He frankly stated that he knew that his action was unlawful;[2] that it had been carefully planned;[3] that he sincerely desired

---

1. For example, at page 23 of the separately paginated transcript of defendant's testimony (hereafter Tr.), appellant was asked: "Where did you go to school after you finished this secondary school, Michael?" His uncompleted answer was interrupted at page 48 for a short recess. His answer to the next question, "Michael, describe for us your life, your experiences in Pueblo and its meaning to you" was interrupted on page 78 by the noon recess.

2. "All right. Now, what I did was breaking the law, yes, I was conscious of it, yes, I was conscious of it. It was an act of destruction. It was burning of paper. It was burglary. It was interfering with the Selective Service as it would be termed in this court." (Tr. 132).

3. "I came back home determined I would try to begin to try and muster the kind of courage these men had, begin to see how we could most communicate with the society in Milwaukee and remain human, you see. So, we found ourselves in essence thinking of a draft board action, which is what it became. And so, I set out on the tough work, and others probably did, too, meeting friends who would be willing to come together in a community of risk, who would be willing to act in the way that the Barrigan's (phonetically) acted, act not just destroy files and run away, but men who would be willing to present —and women—who would be willing to present themselves to the community, to the Milwaukee community and say: yes,

the act to be "nonviolent," and was convinced that it was for the common good.[4]

The bulk of his testimony described "the important marks," which purportedly explained the "compulsion" that motivated his crime. He described his boyhood in Ireland;[5] his abortive attempt to become a missionary;[6] his education at a Trappist seminary; his emigration to the United States; his heroes;[7] his abandonment of profitable employment in the insurance business to organize a shelter for the poor in Milwaukee; and his concern about the ills of society, including the commitment of substantial funds for war purposes when they are so badly needed to help the poor and the victims of discrimination. He explained that a man is "compelled" to live by his conscience:

we are responsible for this act of destruction, burning of paper." (Tr. 118–119)

\* \* \* \* \*

"We were from the City of Milwaukee, and we were responsible for the casing— what we call the casing. It means checking out a place, the casing of the joint or the casing of the building, because in essence, what it was—it was a robbery job, sure, except we didn't want to loot." (Tr. 121–122)

4. "But what we were doing is to get into that building without hurting any person, without harming any person; and that was the deepest concern of all of us. And I just put this footnote in here: I feel sad that any harm has come to any person, and I felt that that one woman particularly—the cleaning women, who are good women, are not necessarily anywhere near responsible for the war. That was tough and hard time. To be nonviolent was what we had to be. And it would have been better if that action would have aborted itself than to harm any one of these persons." (Tr. 122)

\* \* \* \* \*

"And we are free enough in this society and allowing one another the freedom because we know we will act on behalf of the common good. On behalf of the common good." (Tr. 132)

5. He referred to the legendary character for whom his native village was named who had destroyed his lover because she impeded his access to heaven. "St. Kevin said he'd never make it to Heaven if his

"It's something you feel in the very depths of your bones, the marrow of your bones, and you live—you have to live if you really understand your faith, you live it. You are compelled, as we were compelled in essence to act in like manner, whether it was back in 1966 when we opened the hospitality house that we responded to some very human needs, whether it was fasting later on, whether it was burning files later on, whether it's living the way I have been living the last year." (Tr. 57)

\* \* \* \* \* \*

"All of us have to find what's best for us to do to change the future and direction of this society, in order that we all have some kind of future in this society on a global scale. So, that's

lover kept after him. She was a detriment to his soul; so, he pushed her off of the mountain. She landed in the lake, never came out of the lake." (Tr. 19–20)

6. "You wanted to build a new society. You wanted to be a part of the building of that new society. To me, that's a missionary." (Tr. 25)

\* \* \* \* \*

". . . I wanted to be more than the builder of churches and buildings." (Tr. 27)

\* \* \* \* \*

"The people, of course, in my home town said: 'Oh, he couldn't make it!' That was sort of a slap in the mouth, saying: 'You didn't have the courage, Cullen.' I said: by God, if I ever go again to do what I now want to do, I'll never return in a sense till I have got what I wanted and what I want to be. So, that was an important mark." (Tr. 28)

7. Mahatma Gandhi, Martin Luther King, Pope John XXIII, Father Groppi, Peter Moorhaus, Dorothy Day (organizer of the hospitality house in New York), Carl Myer ("He stood up for life against capital punishment in this society and one of these demonstrations was in 1964, I believe it was, he marched a walk from— excuse me, from Chicago—Springfield, pulling a wheelbarrow with an electric chair in it to dramatize what we are doing when we put men to death. . . .") (Tr. 104); and others.

where it began in my mind." (Tr. 118)

With respect to the special compulsion that led to the public burning of draft board records, he stated:

"Did I burn files? Yes, I did. Did I enter a draft board? Yes, I did. Did I do with the free will? Well, if you call free will did anybody coerce me, no, no one coerced me, but a free will, I am not sure. I would say this, I had to do what I did, lest we be mad, and lest we go insane as a society and as a people and as a person. (Tr. 145)

\* \* \* \* \* \*

"I did what I did lest I be judged not a man but a coward. I did what I did even though I knew I jeopardized my wife's future and my children. I did what I did because I knew even I jeopardized a future in this society, but I stood with those other men on that day and that evening and that place and that time lest I be judged less a man. I did lest I be condemned. And so I stand before you. So God help me!" (Tr. 167)

He also testified that other standards of behavior must be subordinated to doing "what we know is the right thing for us [and] for the betterment of man."

"Judges and juries are not important. Most important is that we are and we be the best kind of men and women we can possibly be. That's the most important thing. Justice has always been our pride. And we do what we know is the right thing for us. That's the most important thing. That's how history is made and changed for the betterment of man. You see!" (Tr. 76–77)

For purposes of decision we assume that appellant's conduct was sincerely motivated by a noble and unselfish purpose.

## II.

■ Appellant's conduct violated two federal statutes. One prohibits the willful destruction of public records;[8] the other the knowing interference with the administration of the Selective Service laws.[9] The first offense may be committed without interfering with the administration of the Selective Service System, and the second without destroying any documents. Under the classic test for determining whether he was charged with two offenses or only one, it is clear that neither is included within the other. See Blockburger v. United States, 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306. We are not presented with any double jeopardy, or successive prosecution problem, *cf.* Harris v. Washington, 404 U.S. 55, 92 S.Ct. 183, 30 L.Ed.2d 212; United States v. Fusco, 427 F.2d 361 (7th Cir. 1970), but merely with the question whether the indictment charges two separate offenses. We are satisfied that it does.

## III.

■ Both statutory offenses include an element of intent. Appellant's denial of an unlawful intent was predicated on a religious or perhaps quasi-religious base. He, therefore, requested the trial judge to ask a number of questions of the

---

8. 18 U.S.C. § 2071(a) provides:
"(a) Whoever willfully and unlawfully conceals, removes, mutilates, obliterates, or destroys, or attempts to do so, or, with intent to do so takes and carries away any record, proceeding, map, book, paper, document, or other thing, filed or deposited with any clerk or officer of any court of the United States, or in any public office, or with any judicial or public officer of the United States, shall be fined not more than $2,000 or imprisoned not more than three years, or both."

9. 50 App.U.S.C. § 462(a) provides, in part, that " . . . any person or persons who shall knowingly hinder or interfere or attempt to do so in any way by force or violence or otherwise, with the administration of this title . . . shall, upon conviction . . . be punished by imprisonment for not more than five years or a fine of not more than $10,000, or by both. . . ."

prospective jurors relating to their religious beliefs and attitudes toward authority. A review of the record indicates that the judge properly exercised his discretion in not prolonging the *voir dire* examination as requested by appellant, particularly since some of the proposed questions might have been interpreted as indicating a measure of approval of appellant's theory of defense, which we believe the district court correctly rejected.

## IV.

■ Appellant's principal claim is that the district court refused a series of tendered instructions embodying the theory that appellant was compelled by his religious beliefs to act as he did and, therefore, did not have the requisite intent to commit the offenses charged.

The trial judge instructed the jury that the Government was obliged to prove all of the elements of both offenses, including specific intent, which he defined as more than a mere intent to commit an act but as also including a deliberate purpose to violate the law.[10] He carefully differentiated between motive and intent:

"Intent and motive should never be confused. Motive is what prompts a person to act. Intent refers only to the state of mind with which the act is done. Good motive alone is never a defense where the act done is a crime. One may not commit a crime and be excused from criminal liability because he desired or expected that ultimate good would result from his criminal act. Moreover, if one commits a crime under the belief, however sincere, that his conduct was religiously, politically or morally required, that is no defense to the commission of a crime." (Trial Tr. 775–777)

The instructions proposed by appellant, which the district court refused to give, are exemplified by the following:

"You are instructed that it is Michael Cullen's theory of defense that his religious beliefs compelled him to commit the acts with which he is charged, and that on September 24, 1968, he had no choice but to act as he did.

"If the evidence you have heard upon this trial in support of this compulsion creates in your mind a reasonable doubt whether Michael Cullen had the specific criminal intent to commit these acts, then, as a matter of law, you must find the defendant not guilty." [11]

■ Relying on United States v. Vole, 435 F.2d 774 (7th Cir. 1970), appellant contends that he was entitled to have the court explain his theory of defense to the jury. But as *Vole* plainly states, he has no such right unless his theory has both legal and evidentiary support. See 435 F.2d at 776–777. In this case, appellant's evidence does not support any acceptable legal theory.

Appellant contends that his evidence of "compulsion" is relevant to the issue of intent. To put this contention in proper perspective, it is appropriate to recognize that the term "intent" may be used in at least three different senses: First, that the prohibited act was performed deliberately; second, that defendant knew it was wrong; and third, that it was designed to further some ultimate goal. In the narrowest sense, every crime must be the product of defendant's free will; it must reflect his choice to perform the criminal act. If the act itself was the result of a mere reflex, or muscular spasm, or was caused by physical duress or compulsion, even the narrowest intent would be absent and the defendant would be innocent of crime;

---

10. "The word 'wilfully,' as used in the crimes charged, means the act was committed by the Defendant voluntarily with knowledge that it was prohibited by law and with the purpose of violating the law and not by mistake or accident." (Trial Tr. 777)

11. At the conference on instructions, defendant orally proposed that the court substitute " . . . you may acquit him" in place of " . . . you must find the defendant not guilty." (Trial Tr. 740)

indeed, it could be said that he did not act at all. It is in this sense that the traditional defense of "compulsion" or "necessity" may justify an act that would be unlawful if it had reflected a deliberate exercise of the defendant's free will.[12]

Appellant's evidence does not remotely support a contention that his conduct was the product of any such compulsion. Such a characterization would be inconsistent with his own testimony explaining that he was acting in accordance with the dictates of his conscience. The traditional defense is plainly inapplicable here.

In a second sense, the term "intent" encompasses a "consciousness of wrongdoing." Such knowledge differentiates most crimes from statutory offenses which may be committed "though consciousness of wrongdoing be totally wanting." See United States v. Dotterweich, 320 U.S. 277, 284, 64 S.Ct. 134, 138, 88 L.Ed. 48. The Supreme Court's opinion in Morissette v. United States, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288, on which appellant heavily relies, dealt with the question whether this type of intent was an element of the offense of converting Government property. Morissette had admittedly taken three tons of rusted bomb casings from a Government target area, but testified that he believed they had been abandoned. The Government contended, and the lower courts held, that such belief was irrelevant because consciousness of wrongdoing was not an element of the offense defined by 18 U.S.C. § 641. The Supreme Court held to the contrary, distinguishing cases like Dotterweich, United States v. Balint, 258 U.S. 250, 42 S.Ct. 301, 66 L.Ed. 604, and United States v. Behrman, 258 U.S. 280, 42 S.Ct. 303, 66 L.Ed. 619.

The issue presented by Morissette is not presented here. The Government recognizes, and the judge's instructions plainly stated, that knowledge of illegality was an element of each of the offenses committed by appellant. He candidly admitted that he had such knowledge. Accordingly, his reliance on Morissette is plainly misplaced.

A third sense in which the term "intent" is sometimes used is that of ultimate purpose or "motive" as that term was explained in the district court's instructions. In some situations the defendant's ultimate objective may be an element of the particular offense charged. Thus, to prove treason, a purpose to give aid and comfort to the enemy must be established;[13] to prove a criminal at-

---

12. The general rule on "compulsion" was stated, citing numerous state cases, in Shannon v. United States, 76 F.2d 490, 493 (10th Cir. 1935):

"Coercion which will excuse the commission of a criminal act must be immediate and of such nature as to induce a well-grounded apprehension of death or serious bodily injury if the act is not done. One who has full opportunity to avoid the act without danger of that kind cannot invoke the doctrine of coercion and is not entitled to an instruction submitting that question to the jury."

The rule is the same whether the label is "compulsion," "coercion," or "necessity,". See United States v. Anthony, 145 F.Supp. 323, 339 (M.D.Pa.1956); R. I. Recreation Center v. Aetna Casualty & Surety Co., 177 F.2d 603, 605 (1st Cir. 1949):

"But to provide an excuse the compulsion must be present, immediate and impending, and of such a nature as to induce a well-founded fear of death or at least serious bodily injury."

The Wisconsin statutory provision on necessity refers specifically to "pressure of natural physical forces" and requires "imminent public disaster, or imminent death or great bodily harm," Wisc.Stat. Ann. § 939.47. See also Model Penal Code § 3.02 (Proposed Official Draft) and 38 Smith-Hurd Ill.Stat.Ann. § 7–13 which covers the "necessity" justification. The commentary following the Illinois provision, which also refers to the Model Penal Code commentary, clearly indicates that even so broad a provision as the Illinois statute, which has no direct applicability to prosecution for violation of federal statutes, would not recognize Cullen's theory of religious "compulsion."

13. Cramer v. United States, 325 U.S. 1, 65 S.Ct. 918, 89 L.Ed. 1441; Haupt v. United States, 330 U.S. 631, 67 S.Ct. 874, 91 L.Ed. 1145. Appellant's reliance

tempt an analysis of the defendant's purpose beyond the overt act actually completed is necessary;[14] and to establish some forms of "malice,"[15] the reasons why the defendant acted as he did may be critical. In such cases, the prosecution has the burden of proving improper motive and it would, therefore, be entirely proper for a defendant to respond with evidence of good motive. But improper motive is not an element of either of the offenses committed by appellant; accordingly, evidence which merely relates to his good motive does not tend to disprove his admitted consciousness of wrongdoing.

In a case such as this, if the proof discloses that the prohibited act was voluntary, and that the defendant actually knew, or reasonably should have known, that it was a public wrong, the burden of proving the requisite intent has been met; proof of motive, good or bad, has no relevance to that issue.

If defendant's theory of defense were valid, the character of his conduct would be judged not by the rule of law but by the end which his means were designed to serve. His theory is merely another variety of an age-old argument. If a religious, moral, or political purpose may exculpate illegal behavior, one might commit bigamy to avoid eternal damnation;[16] steal from the rich to give alms to the poor; burn and destroy, not merely public records or perhaps buildings but even public servants as well, to implement a Utopian design.

One who elects to serve mankind by taking the law into his own hands thereby demonstrates his conviction that his own ability to determine policy is superior to democratic decision making.[17] Appellant's professed unselfish motivation, rather than a justification, actually identifies a form of arrogance which organized society cannot tolerate.

A simple rule, reiterated by a peaceloving scholar, amply refutes appellant's arrogant theory of defense: "No man or group is above the law."[18]

The judgment is affirmed.

---

on cases like *Cramer* and *Haupt* is misplaced because the Government's burden here includes no obligation to prove adherence to an enemy cause or any comparable improper motive.

14. "The accompanying intent in that case renders the otherwise innocent act harmful, because it raises a probability that it will be followed by such other acts and events as will all together result in harm. The importance of the intent is not to show that the act was wicked, but to show that it was likely to be followed by hurtful consequences." Holmes, The Common Law, pp. 67–68.

15. In some jurisdictions the offense of malicious mischief may require that the injury shall have been done with an "evil" mind or out of a spirit of cruelty, hostility, or revenge. Schtul v. People, 96 Colo. 217, 40 P.2d 970, 972 (1935); Larson v. Fireman's Fund Ins. Co., 258 Iowa 348, 139 N.W.2d 174, 177 (1965).

16. "To permit this would be to make the professed doctrines of religious belief superior to the law of the land, and in effect to permit every citizen to become a law unto himself. Government could exist only in name under such circumstances." Reynolds v. United States, 98 U.S. 145, 167, 25 L.Ed. 244.

17. An unselfish motive affords no assurance that a crime will produce the result its perpetrator intends. After the assassination of Jean Paul Marat in July 1793, Charlotte Corday wrote: ". . . I confess I made use of a treacherous trick to induce him to receive me; but in such circumstances the end justifies the means. . . . But if one saves one's country one must not think of the price that has to be paid. May Peace be established as quickly as I hope it will be. A great step has been taken in that direction without which we never should have had it. . . ." (As translated by Stanley Loomis at p. 138 of Paris in the Terror, June 1793—July 1794.) The events which ensued proceeded in precisely the opposite direction from that intended or expected by Mlle. Corday.

18. United States v. United Mine Workers, 330 U.S. 258, Rutledge, J., dissenting at p. 343 and again at p. 385, 67 S.Ct. 677, at pp. 720, 741, 91 L.Ed. 884.