Frederick J. CHASE et al., Defendants-Appellants,

v.

UNITED STATES of America, Plaintiff-Appellee.

Nos. 18915, 18920, 18922, 18923.

United States Court of Appeals, Seventh Circuit.

Argued May 15, 1972.

Decided Oct. 4, 1972.

Rehearing Denied Nov. 1, 1972.

**142**

Anthony P. Locricchio, St. Clair Shores, Mich., Patrick J. Hughes, Jr., Frank W. Oliver, Arthur M. Sussman, Jerold S. Solovy, Chicago, Ill., for defendants-appellants.

James R. Thompson, U. S. Atty., Gordon B. Nash, Jr., John Peter Lulinski, Jeffrey Cole, Asst. U. S. Attys., Chicago, Ill., for plaintiff-appellee.

Before CUMMINGS, PELL and STEVENS, Circuit Judges.

STEVENS, Circuit Judge.

Before dawn on May 25, 1969, appellants broke into the premises at 63rd and Western Avenue in Chicago, ransacked a Selective Service Office, removed large quantities of government records, and burned them in an alley behind the draft office.[1]

Each of the eight appellants was indicted, tried before a jury, and convicted on each of four counts.[2] That each did the acts alleged is not disputed. Moreover, viewing the proceedings as a whole, it is equally clear that each defendant received a fair trial. Their appeals raise various procedural contentions in which we find no merit.

■ The reasons why we reject some of the contentions may be briefly stated. Subsequent to the trial of this case we affirmed the conviction of a participant in a similar incident in Milwaukee. The discussion of "motivation" and "intent" in United States v. Cullen, 454 F.2d 386 (7th Cir. 1971), adequately explains why

---

I. Fifteen persons were indicted on June 3, 1969: Frederick Joseph Chase, William Anthony Durkin, Charles George Fullenkamp, Edward Augustine Gargan, Edward Charles Hoffmans, Margaret Ann Katroscik, John Alfred Loll, Joseph Edward Mulligan, Charles Louis Muse, Linda J. Quint, Nicholas J. Riddell, William Patrick Sweeney, John J. Phillips, Gian Filippo Pietra, and Charles Thomas Smit. On May 5, 1970, defendants Loll, Phillips, Pietra, and Smit did not appear for trial and their cases were severed. Defendant Hoffmans was found not mentally competent to stand trial and was also severed on June 3, 1970. On the same day, defendants Quint and Riddell failed to appear. On June 5, the jury returned verdicts of guilty against Chase, Quint, Riddell, Durkin, Gargan, Fullenkamp, Katroscik, Mulligan, Muse, and Sweeney. Appeals were taken by all ten. On April 12, 1972, we vacated the judgment of conviction as to Riddell and Quint and remanded for resentencing. This opinion therefore relates to the remaining eight defendants.

2. The charges were: (1) willful damage to government property in violation of 18 U.S.C. § 1361, (2) removal, mutilation and destruction of records in violation of 18 U.S.C. § 2071, (3) interfering with the administration of the Military Selective Service Act in violation of 50 U.S.C.App. § 462(a), and (4) conspiracy to commit the above offenses in violation of 18 U.S.C. § 371. Three defendants received consecutive five-year sentences on counts 3 and 4; each of the others received concurring five-year sentences on those counts. On counts 1 and 2 all defendants received a sentence of probation for a five-year period commencing at the expiration of the sentences imposed on counts 3 and 4.

we reject the arguments that the trial judge erroneously restricted appellants' testimony, and improperly instructed the jury, on the issue of "intent."

■ The contention that this indictment was multiplicitous is also foreclosed by the reasoning which persuaded us to reject a similar contention in *Cullen.* See 454 F.2d 386, 389. See also United States v. Chase, 309 F.Supp. 430, 433 (N.D.Ill.1970).

■■ Appellants argue that count 4 of the indictment, alleging a conspiracy from April 15 to June 3, 1969, was, in effect, amended at trial because the government's evidence of conspiracy concerned only May 24 and May 25, 1969. The difference between the charge and the proof was not a variance[3] and did not prejudice defendants.[4]

■ All appellants except Chase argue that they were entitled to a severance because they were prejudiced by his refusals to rise at the commencement of each court session, and by the court's determination that the refusals were contemptuous.[5] Although Chase, of course, may have been prejudiced by his own obstinate refusal to conform to accepted court procedures, we find no basis in the record for inferring that any other defendant was prejudiced in the slightest. The denial of the motion for a severance was well within the trial judge's broad discretion. United States

v. Cervantes, 466 F.2d 736 (7th Cir., 1972); United States v. Kahn, 381 F.2d 824, 838–841 (7th Cir. 1967); United States v. Echeles, 352 F.2d 892 (7th Cir. 1965).

The remaining contentions are that (1) the grand and petit juries were improperly selected; (2) the voir dire examination of prospective jurors was inadequate; and (3) various categories of evidence offered to support the "insanity" defense were improperly excluded. We shall discuss these points separately.

## I.

Defendants contend that "young adults" were inadequately represented on both the grand jury, which indicted them in June of 1969, and the petit jury, which tried them a year later. Whereas the "under 25 age group" represented about 8.7% of the total population in the Eastern Division of the Northern District of Illinois, only 2.3% of the May, 1970, venire was in this age bracket. This "under representation of the under 25 group" resulted from the facts (1) that the list of prospective jurors assembled in June of 1968 was not supplemented by the addition of citizens who attained the age of 21 thereafter but before the respective juries were selected, and (2) when the list was compiled, the source of names included voter registration lists from some counties which had been compiled in 1966. Thus, at the

---

3. This is not a case, such as Stirone v. United States, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252, in which the government proved an essential matter which had not been alleged in the indictment. The evidence of defendants' conduct on May 24 and 25 was *within* the period alleged in the indictment, and they certainly anticipated that such evidence would be offered. *Cf.* Russell v. United States, 429 F.2d 237, 238 (5th Cir. 1970); United States v. Edelman, 414 F.2d 539, 542 (2d Cir. 1969).

4. The claim of prejudice is predicated on the fact that the judge excluded evidence offered on behalf of four defendants to prove their "insanity" on dates other than May 24 and 25, but within the period described in the indictment. The

evidence was properly excluded for reasons unrelated to the dates involved. See part III of this opinion. Moreover, since the government abandoned any attempt to prove an offense on any date other than May 24 and 25, defendants could not be prejudiced by their failure to establish their innocence on any other date. The trial court did not hold, and neither do we, that evidence of conduct on dates other than May 24 and 25 may never be relevant to a determination of a defendant's mental capacity on those dates. However, insanity on April 15 would not be a defense to a crime committed on May 25.

5. See In re Chase, 468 F.2d 128 (7th Cir., 1972).

time of trial in 1970, all of the prospective jurors from those counties were at least 25 years old, and even those whose names were on voting lists in 1968 were at least 23.

Defendants contend that both their constitutional and statutory rights were violated. Although the two contentions are somewhat blurred in their brief, we shall discuss them separately.

## A.

In support of their claim of a constitutional violation, appellants rely on cases holding that defendants indicted or convicted by juries from which black citizens were "intentionally and systematically excluded . . . solely on account of their race and color" are denied equal protection of the laws.[6] Although these cases involved the application of the Equal Protection Clause of the Fourteenth Amendment to state criminal trials, presumably the Due Process Clause of the Fifth Amendment would prevent the federal government from making such an arbitrary classification of persons ineligible for jury service. Cf. Bolling v. Sharpe, 347 U.S. 497, 500, 74 S.Ct. 693, 98 L.Ed. 884. See Peters v. Kiff, 407 U.S. 493, 501–504, 92 S.Ct. 2163, 33 L.Ed.2d 83. This record discloses no such irrational classification.

Defendants do not question the right of either Congress or the judiciary to specify a reasonable minimum or maximum age for jury service. A minimum age of 25 years was sustained by the First Circuit in 1965,[7] and even though the minimum voting age has now been reduced to 18,[8] defendants accept the validity of the 21-year minimum specified by the Jury Selection and Service Act of 1968.[9] Accepting that minimum, defendants in effect argue that the government may not arbitrarily place "young adults" in a different category from their elders.

The first difficulty with this contention is that the government has not intentionally made any such classification between young adults and other adults; it is defendants who have elected to assemble certain statistical evidence relating specifically to the 21–24 age bracket for the year 1970 when they were tried. They acknowledge, however, that the factors which differentiate the attitudes of young jurors from their elders are not confined to an "under 25 class" but might as logically support a "young adult" category of up to 30 or even 35 years of age. There is no clearly defined class of young adults which has been the target of disfavored treatment in the selection of prospective jurors.

6. Smith v. Texas, 311 U.S. 128, 129, 61 S.Ct. 164, 85 L.Ed. 84. "For over 90 years, it has been established that a criminal conviction of a Negro cannot stand under the Equal Protection Clause of the Fourteenth Amendment if it is based on an indictment of a grand jury from which Negroes were excluded by reason of their race. Strauder v. West Virginia, 100 U.S. 303, 25 L.Ed. 664 (1880); Neal v. Delaware, 103 U.S. 370, 26 L.Ed. 567 (1881)." Alexander v. Louisiana, 405 U.S. 625, 628, 92 S.Ct. 1221, 1224, 31 L.Ed.2d 536. To the same effect, see Eubanks v. Louisiana, 356 U.S. 584, 78 S.Ct. 970, 2 L.Ed.2d 991; Hernandez v. Texas, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866; Pierre v. Louisiana, 306 U.S. 354, 59 S.Ct. 536, 83 L.Ed. 757; Norris v. Alabama, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074.

7. In King v. United States the First Circuit held that a jury selection method in effect in the Massachusetts Federal District Court which, following state law, automatically excluded persons 21 through 25 years of age and those over 70 years of age did not violate the principle that a jury represent a cross section of the community.
   "The mere fact that there might be fewer young persons on the jury, and fewer of the oldest, than the exact proportion of such persons existing in the community does not itself make a jury nonrepresentative." King v. United States, 346 F.2d 123, 124 (1965).

8. U.S.Const. amend. XXVI. See also 42 U.S.C. §§ 1973bb, 1973bb–1.

9. Ch. 121, § 101, 82 Stat. 53, 58 (codified at 28 U.S.C. § 1865(b)(1) (1970)).

The second difficulty with the constitutional claim is that even if the statistical evidence is considered sufficient to raise an inference of discrimination against a vaguely defined class, that inference is dispelled by the fact that the under representation of "young adults" has a perfectly logical explanation which does not fit the "intentional and systematic" test applied in the racial discrimination cases. Since the number of citizens who have passed their twenty-first birthday changes every day, whereas lists of voters and lists of prospective voters are necessarily prepared and revised only on a periodic basis, some under representation of young adults on those lists is inevitable. The Jury Selection and Service Act of 1968 requires that jury lists shall be updated periodically; the Northern District of Illinois updates its lists every two years. Considering the cost and the administrative problems associated with the preparation and substitution of new lists, there is certainly no basis for an argument that the Constitution requires more frequent revisions even though more prompt updating might be desirable.

■ Similarly, although it no doubt would have been better practice for the Clerk of the United States District Court for the Northern District of Illinois to take whatever steps were neces-

sary to obtain 1968 lists from the counties in which the most recent voter lists had been assembled in 1966, it is manifest that this failure was merely the consequence of a good faith effort to comply promptly with the newly enacted requirements of the 1968 statute.[10] We find no basis in the record for a conclusion that there was systematic and intentional discrimination against young adults or any specific age grouping of citizens eligible for jury service.[11] There is no constitutional defect in either the grand jury or the petit jury.

### B.

Defendants' principal attack on the jury panel is that the under representation of young adults violated the Jury Selection and Service Act of 1968. More narrowly, they contend that the Clerk's implementation of the new random selection plan did not give proper effect to the congressional declaration of policy set forth in 28 U.S.C. § 1861. That section provides, in part:

"It is the policy of the United States that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes. . . ."

---

10. A new plan providing for the random selection of jurors pursuant to the 1968 statute was put into effect in the Northern District of Illinois in the summer of 1968, after approval by a reviewing panel. The voter registration lists used by the Clerk in implementing that plan were acquired in June and July of 1968 pursuant to a request for current lists.

11. *Cf.* Glasser v. United States, 315 U.S. 60, 64–65, 62 S.Ct. 457, 86 L.Ed. 680, in which the Supreme Court refused to set aside an indictment returned by a grand jury composed entirely of men notwithstanding the fact that women had been eligible for jury service for a period of almost two months when the jury was summoned.

Although not cited by appellants, we note that the Supreme Court condemned the "systematic" exclusion of Negroes in

Carter v. Jury Commission, 396 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d 549, and Turner v. Fouche, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567, without repeating the "intentional" part of the test used in the earlier cases cited in footnote 6, *supra.* *Carter*, however, made reference to the refusal "to consider the appellants for jury service *solely because of their race*," 396 U.S. at 330, 90 S.Ct. at 523 (emphasis added); and in *Turner* the *prima facie* case rested on evidence of an unexplained "substantial disparity" resulting at least in part from a "selection process where the jury commissioners invoked their subjective judgment rather than objective criteria." 396 U.S. at 360, 90 S.Ct. at 540. This case involves no such unexplained substantial disparity nor did the selection process invoke the district court clerk's subjective judgment.

They rely on cases holding that exclusion from service on account of sex, Ballard v. United States, 329 U.S. 187, 67 S.Ct. 261, 91 L.Ed. 181, or economic status, Thiel v. Southern Pacific Co., 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181, requires that an indictment or conviction be set aside. They argue that the rationale of those cases also forecloses the exclusion of young adults from federal jury service.

The defects in their constitutional contention also undermine their statutory claim. Both *Ballard* and *Thiel* involved a "systematic and intentional" exclusion of the plainly identified class, unlike the by-product of a good faith attempt to implement a new plan evidenced by this record.[12]

Although the declaration of policy in § 1861 may impliedly prohibit systematic and intentional discrimination against any cognizable segment of the community, it is noteworthy that the specific implementation of that policy in § 1862 omits any reference to discrimination on account of age.[13] Like *Ballard* and *Thiel*, that section expressly prohibits exclusion on account of sex or economic status, but provides no protection for "young adults." It is likewise significant that the Supreme Court's enumeration of the components of a cross section of the community—"economic, social, religious, racial, political and geographical groups"—fails to mention age groups.[14]

We do not hold that the requirement of random selection for a cross section of the community has no application to age brackets. Quite clearly, however, a claim of discrimination against young adults is insufficient unless "intentional and systematic" exclusion is established. The evidence does not meet that requirement.[15]

II.

This trial was well attended by spectators and well publicized by the press. The record indicates that extra marshals were on duty and that spectators were searched before they could enter the courtroom. On the first three days of the proceedings prospective jurors apparently witnessed the search of spectators trying to enter the room. Upon being advised of this fact, the court indicated that during the *voir dire* he would endeavor to ascertain whether "anything that has taken place here in

12. In *Ballard*, it was conceded that women were "intentionally and systematically excluded" contrary to statute. 329 U.S. at 189–190, 67 S.Ct. 261. The discrimination in *Thiel* was also admitted. There, officials, believing that such persons are ordinarily excused by the court on hardship grounds, deleted daily wage earners from the list. "Both the clerk of the court and the jury commissioner testified that they deliberately and intentionally excluded from the jury lists all persons who work for a daily wage." 328 U.S. at 221, 66 S.Ct. at 986. The record in this case reveals no such discrimination. Indeed, the testimony provides a perfectly reasonable and compelling explanation for the deficiencies in the lists.

13. 28 U.S.C. § 1862 provides:
"*Discrimination prohibited.*
"No citizen shall be excluded from service as a grand or petit juror in the district courts of the United States on account of race, color, religion, sex, national origin, or economic status."

14. "This does not mean, of course, that every jury must contain representatives of all the economic, social, religious, racial, political and geographical groups of the community; frequently such complete representation would be impossible. But it does mean that prospective jurors shall be selected by court officials without systematic and intentional exclusion of any of these groups." Thiel v. Southern Pacific Co., 328 U.S. 217, 220, 66 S.Ct. 984, 985, 90 L.Ed. 1181.

15. Our decision is supported by the holdings in United States v. Kuhn, 441 F.2d 179 (5th Cir. 1971) and United States v. Di Tommaso, 405 F.2d 385, 391 (4th Cir. 1968), and by our disposition of a comparable contention in United States v. Gast, 457 F.2d 141, 142–143 (7th Cir. 1972); moreover, since this is not a case in which "significant unexplained disparities exist," our decision is also consistent with the analysis of the issue in United States v. Butera, 420 F.2d 564, 569 (1st Cir. 1970).

the last three days" might have prejudiced any of the prospective jurors.[16]

The judge conducted the *voir dire* himself. It was extensive and did cover various sources of possible prejudice, including the pretrial publicity. See Tr. 54–213, 229–371. Nevertheless, he did not specifically inquire about the possibility that the courtroom security precautions might have prejudiced the prospective jurors. Defendants did not object to this omission at the conclusion of the *voir dire*. No instructions were given to the jury on this subject and none were requested by defendants.

We agree with defendants' appraisal of the importance of an adequate *voir dire* examination.[17] We also recognize, as defendants argue, that unusual security measures create a risk of prejudice to the accused.[18] That risk could have been minimized by appropriate instructions, had they been requested, but conceivably would have been enhanced if the subject had been emphasized during the *voir dire*. In any event, the risk of prejudice must be weighed in the context of the entire proceeding.

■ As we view the record, it is inconceivable that the verdict could be characterized as the product of any prejudice on the part of the jury against the accused. The defendant's participation in the destruction and burning of draft records was not disputed. They advanced no theory of defense having even arguable merit. We are satisfied that the evidence of their guilt is so overwhelmingly clear that the possibility of prejudice in a relatively minor omission from the *voir dire* does not justify a new trial.

We do not believe the trial judge abused his broad discretion in the conduct of the *voir dire* by failing to ask the jurors about their reaction to a possible source of prejudice; even if he did, we hold that the omission would be harmless error.

### III.

During the trial four of the defendants relied on a defense of "insanity."[19] They made no claim that they lacked the volitional capacity to refrain from engaging in wrongful conduct. Nor did they claim that they lacked the mental capacity to stand trial or to cooperate with their counsel. The defense was that these four, by reason of mental illness, could not distinguish between right and wrong when they vandalized the Selective Service office.[20]

16. "As far as the situation is that has been discussed here . . . ., this Court will endeavor, to the best of its ability, in the voir dire examination, to ascertain whether or not by anything that has taken place here in the last three days any of the prospective jurors might or could be prejudiced.
"You may rest assured that anybody who indicates he might or could be prejudiced will not sit on the jury." Tr. 17.
The court's assurances were given in response to defense counsel's motion to dismiss the entire jury panel. Tr. 16.

17. See Judge Pell's discussion in United States v. Lewin, 467 F.2d 1132 (7th Cir. 1972). That case involved the refusal to ask a question which would have elicited factual information about the jurors' background, whereas the omitted question in this case would merely have called for a juror's expression of opinion as to his own impartiality in the light of

facts which presumably were evident even though unmentioned when general questions about the juror's ability to serve impartially were asked.

18. United States v. Esquer, 459 F.2d 431, 433 (7th Cir. 1972).

19. Defendants Riddell, Quint, Durkin, and Gargan raised this defense at trial. Only Durkin and Gargan are parties to this appeal. See note 1, *supra*.

20. "In short, consistent with United States v. Shapiro, 383 F.2d [680] (7 Cir., 1967) it was urged for these appellants that they lacked the cognitive capacity to distinguish between right and wrong such that they could know the nature and the quality of their acts.

  . . .

    \*    \*    \*    \*    \*

"*Shapiro* accordingly extends the defense to those situations where there is lack of volitional capacity as, in this court's

There is virtually nothing in the record to suggest that any of the defendants was suffering from any legally cognizable mental illness on May 24 or May 25, 1969, or that they did not fully understand that their conduct was "wrong" as measured by the standards prescribed by society. Their evidence of "insanity" merely tended to prove that their moral judgment as to whether certain conduct—specifically their own deliberate violations of law—was "right" or "wrong" was at odds with the judgment expressed by society at large. Under the standards for determining criminal responsibility which we have adopted in this circuit, United States v. Shapiro, 383 F.2d 680 (7th Cir. 1967) (en banc), this defense was manifestly frivolous.

Like the conduct for which defendants were indicted, the assertion of their insanity defense had a "double effect."[21] It enabled them to dramatize their conviction that the government is "wrong" and they are "right" about such matters as the war, imperialism, and the draft. But it also compelled their counsel to describe them as persons who "lack the cognitive capacity to distinguish between right and wrong."[22] The trial judge properly excluded certain evidence which would have contributed to the former effect, but would have provided no support for the claim that these defendants could not comprehend the criminal character of their conduct. Thus, an anthropologist was not allowed to testify that the defendants believed their conduct was morally correct, and further, that the same conduct might be considered sane in one culture and insane in another;[23] each of the four purportedly "insane" defendants was not permitted to express an opinion—based on the mere fact that each believed he was "right"—on his colleagues' ability to differentiate between right and wrong; and the inquiry into defendants' competence was limited for the most part to the dates on which they violated the law.[24]

Additionally, a professor of electrical engineering and biology, who lectured on what "might loosely be called scientific epistemology,"[25] though permitted to testify about psychiatry and the sources of mental illness,[26] was not permitted to express a medical opinion

---

words, 'an alternative element.' Shapiro, 683–684.

"The defendants in this case did not press the alternative. The defendants here were to rely primarily upon the M'Naghten concept." Appellants' brief in Nos. 18916, 18919, 18921 and 18924, pages 5–6.

21. "The principle of double effect is a principle in Christian moral theology which . . . applies to a situation where a person's intent is to do one thing and as a necessary adjunct or a necessarily associated effect of that, there is something else.

　　*　　*　　*　　*　　*

"I think the principle of double effect comes in there because it was not my intent to destroy draft records as such, to conspire to destroy draft records and so forth.

"My intent, and I think I'm using that in a technical sense, was to influence change in this country and in American foreign policy. So that there was a double effect, obviously.

　　*　　*　　*　　*　　*

"I took part in that action in order to raise issues as a kind of continuation of the educational activities that I had been involved in for a number of years, to try to encourage people to look into the history of the war, and come to some conclusions as to the morality, and the legality of that war, and then to respond as human persons, and as Christians, to respond, even if that would mean that they would have to risk time in prison, or any kind of unpleasantness." Tr. 1724–1725, 3164 (testimony of defendant Mulligan).

22. Appellants' brief, page 5.

23. See Tr. 2557–2559.

24. We think the trial court's limitations in this respect were within its discretion; in any event, since the proffered testimony did not tend to establish a valid insanity defense, this ruling could not have been error.

25. Appellants' brief, page 34.

26. Tr. 2664–2692.

about the defendants as he had not sufficiently examined them;[27] and a mathematician was not allowed to establish the "theoretical validity" of the testimony of the other experts.[28]

The judge's evidentiary rulings were well within the scope of his discretion. We find absolutely no merit in the contention that these four dedicated intellectuals were not given an adequate opportunity to present their defense of "insanity." They received a fair and impartial trial.

The judgments are

Affirmed.

27. On *voir dire* he testified: "In fact, I will go so far as to say they did not consider the act wrong, and what is surprising, to this day they do not consider it wrong." Tr. 2776–2777. Such evidence would have been merely cumulative and, as noted in the text, would not have tended to prove a lack of cognitive capacity.

28. Even defendants admit that this testimony "was not utterly essential to the presentation of the insanity defense." Appellants' brief, page 39. Defendants' proffered definition of insanity, whatever its anthropological or sociological validity, is not determinative of the issue of criminal responsibility. *Cf.* McDonald v. United States, 114 U.S.App.D.C. 120, 312 F.2d 847, 850–851 (1962); Washington v. United States, 129 U.S.App.D.C. 29, 390 F.2d 444, 446 (1967). Since much of the expert testimony was merely definitional in character and did not further the court's inquiry into defendants' mental condition, the trial court properly refused to admit it.

Defendants' attempt to make the test of insanity depend merely on evidence of abnormality is patently absurd. After all, criminal law generally is concerned with abnormal conduct. The question is whether a defendant's mental condition is such as to excuse him from criminal responsibility.