UNITED STATES of America, Appellee,

v.

Jacqueline ALLEN, Clare Grady, Dean Hammer, Elizabeth McAlister, Vern Rossman, Kathleen Rumpf, Karl Smith, Defendants-Appellants.

Nos. 805–811, Dockets 84–1265 to 84–1271.

United States Court of Appeals, Second Circuit.

Argued Feb. 25, 1985.

Decided April 24, 1985.

John F. De Pue, Dept. of Justice, Washington, D.C. (Frederick J. Scullin, Jr., U.S. Atty., N.D.N.Y., Joseph A. Pavone, Asst. U.S. Atty., Syracus, N.Y.), for appellee.

Dean Hammer, defendant-appellant pro se (Susan R. Horn, Susan Finkelstein, Horn, Heins, Finkelstein & Pezzulo, Deborah M. Weissman, Heath, Rosenthal & Weissman, Syracuse, N.Y., Advisory Counsel), for defendants-appellants.

Before OAKES, MESKILL and PIERCE, Circuit Judges.

OAKES, Circuit Judge:

Appellants, antinuclear protesters, were convicted after a jury trial in the United States District Court for the Northern District of New York, Howard G. Munson, Judge, of willful destruction of government

property and conspiracy to destroy government property. On appeal, they argue that their convictions violated the First Amendment religion clauses and that the trial court violated due process and their right to a fair trial by erroneously precluding them from putting before the jury a defense based on international law. We affirm.

On Thanksgiving Day, November 24, 1983, at Griffiss Air Force Base, a Strategic Air Command ("SAC") installation near Rome, New York, the seven appellants engaged in a protest at Hangar 101, which housed a B–52 bomber. When the police inspected the hangar after appellants' arrests outside, they found that the aircraft's skin and bomb-bay doors had been damaged apparently by hammers and crowbars, and that the bomber and an adjacent engine maintenance shop had been spray-painted with slogans. Blades of another B–52 engine turbine rotor were knocked out of place and at least three other jet engines damaged. The damage testified to was in excess of $113,000, but this figure was evidently revised downward in the presentence report to $60,000 because some of the property could be salvaged.

Appellants moved before trial to dismiss the indictment on the basis of the free exercise and establishment clauses of the First Amendment. Their motion was denied. At trial they admitted that they had surreptitiously entered the SAC base to damage government property and had committed the acts charged, but sought to defend their actions on the theory that the damaged weapons systems were developed and deployed in violation of international law, which therefore obligated them to take steps to prevent that violation. The district court, following *United States v. May*, 622 F.2d 1000 (9th Cir.), *cert. denied*, 449 U.S. 984, 101 S.Ct. 402, 66 L.Ed.2d 247 (1980), ruled that appellants lacked standing to assert this defense.

Conviction was under 18 U.S.C. § 1361 (1982), for causing more than $100 damage to property of the United States, and *id.* § 371, for conspiracy. Appellants Allen,

Grady and Rumpf received sentences of two-year concurrent terms on each count, appellants Smith, Rossman, Hammer and McAlister three-year concurrent terms on each count. Appeal was by appellants *pro se* with the assistance of legal advisers; at oral argument appellant Hammer capably presented the theories of law upon which he and his co-appellants rely.

The establishment clause claim is a novel one, both in the theory of what constitutes a religion and in the theory of what constitutes a law respecting the establishment of religion. According to appellants, there has arisen a "national religion of nuclearism ... in which the bomb is the new source of salvation." This "religion" is said to focus on the "acceptance of nuclear weapons as sacred objects." To support the characterization of "nuclearism" as a religion, appellants interpret *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943), as disapproving the establishment of the similar "religion" of "orthodox nationalism." Appellants next argue that the property protection statute, as applied in this case, unconstitutionally advances religion under *Lemon v. Kurtzman*, 403 U.S. 602, 612, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971), and *Epperson v. Arkansas*, 393 U.S. 97, 107, 89 S.Ct. 266, 272, 21 L.Ed.2d 228 (1968), because it has the purpose and primary effect of protecting nuclear weapons—the new nuclearism's "objects of adoration and glorification"— and because even legislation having a secular purpose and facial neutrality, as does the statute in question, may establish religion "if in fact the State is lending direct support to a religious activity," *Roemer v. Board of Public Works*, 426 U.S. 736, 747, 96 S.Ct. 2337, 2345, 49 L.Ed.2d 179 (1976). Appellants contend they should at least have had an evidentiary hearing on the issues of whether "nuclearism" is a religion and whether the application of the property protection statute lends support to that religion in violation of the establishment clause.

In recent years, the concept of religion has certainly broadened. Not long ago we

defined an individual's religion as his " 'ultimate concern'—whatever that concern be." *International Society for Krishna Consciousness, Inc. v. Barber*, 650 F.2d 430, 440 (2d Cir.1981). Under this definition, a touchstone of a religion is the believer's categorical " 'disregard [of] elementary self-interest ... in preference to transgressing [the religion's] tenets.' " *Id.* (quoting *United States v. Kauten*, 133 F.2d 703, 708 (2d Cir.1943)).

This expansive definition of religion has been developed primarily to protect an individual's free exercise of religion, recognizing that an individual's most sincere beliefs do not necessarily fall within traditional religious categories. In this case, however, appellants ask us to recognize as a "religion" what that religion's alleged adherents have not identified as such. We can understand appellants' opinion that those who support nuclear armaments have in reality sacrificed their self-interest to what can only be considered an "ultimate concern"—weapons that have the power to destroy all else. But the new religion's "believers" would likely reject this interpretation of their beliefs and actions. Many nuclear weapons proponents surely belong to established religions, and most believe that our nuclear weapons program is a means to prevent nuclear war, not an end in itself. Congress no doubt believes that it is acting within its authority to "provide for the common Defence and general Welfare of the United States," U.S. Const. art. I, § 8, in authorizing nuclear weapons production. Most who support the nuclear armament program would presumably reverse their position if they felt peace would be served thereby. Indeed, the MX missile, after all, is by some called "Peacekeeper."

■ In essence, then, antinuclear protesters like appellants believe that nuclear weapons have no purpose but destruction, while pronuclear supporters believe that nuclear weapons help to keep the peace. The two sides in the nuclear debate thus differ primarily in their perception of the way the world works, not necessarily in their ultimate concern for peace. This difference we hold to be one of political judgment, not religious belief. *See United States v. Seeger*, 380 U.S. 163, 165, 85 S.Ct. 850, 854, 13 L.Ed.2d 733 (1965) (religious beliefs distinguished from "political, sociological, or philosophical views").

■ In so holding, we adopt for establishment clause purposes the conventional, majority view, rather than appellants' view, of what is religious and what is political. Consequently, we must acknowledge that "religion" can have a different meaning depending on which religion clause of the First Amendment is at issue. It may be that a person who expounds "nuclearism" as his religion, consciously worshipping these weapons as gods of destruction, would be entitled to some protection under the free exercise clause. That the Government advances what is, conceivably, someone's religion, however, does not make what most citizens consider a political or military action a violation of the establishment clause. As Professor Laurence Tribe has noted,

> Clearly, the notion of religion in the free exercise clause must be expanded beyond the closely bounded limits of theism to account for the multiplying forms of recognizably legitimate religious exercise. It is equally clear, however, that in the age of the affirmative and increasingly pervasive state, a less expansive notion of religion was required for establishment clause purposes lest all "humane" programs of government be deemed constitutionally suspect.

L. Tribe, *American Constitutional Law* 827–28 (1978) (footnote omitted); *accord Grove v. Mead School District No. 354*, 753 F.2d 1528, 1541–1542 (9th Cir.1985) (Canby, J., concurring). Professor Tribe goes on to suggest that "all that is *'arguably religious'* should be considered religious in a free exercise analysis," while "anything *'arguably non-religious'* should not be considered religious in applying the establishment clause." *Id.* at 828 (emphasis in original). Although we need not follow him to that extreme in this opinion—

supporting nuclear armaments being a good deal more than "arguably" non-religious—we find his analysis helpful and provocative.

Ironically, the only case appellants cite, *Barnette*, illustrates the Court's implicit adoption in establishment clause analysis of the majority view of what does or does not constitute a religious practice. *See* Freund, *Public Aid to Parochial Schools*, 82 Harv.L.Rev. 1680, 1686 (1969). At issue in *Barnette* was a state law requiring compulsory flag salutes by children. Jehovah's Witnesses refused to participate in these salutes, "regard[ing] the flag-salute as the profanation of a religious gesture, a bowing before idols, a Black Mass in the schoolroom." *Id.* Despite the Witnesses' strong view that a salute is religious, however, the Court did not even consider a possible establishment clause violation, holding instead that the compulsory flag salute law violated the *free exercise* clause by forcing American citizens to express a particular belief, thus infringing on the "individual's right to speak his own mind." *Barnette*, 319 U.S. at 634, 63 S.Ct. at 1183. Although the Court did liken nationalism to religion, comparing the symbols of the state with religious symbols, *id.* at 632, 63 S.Ct. at 1182, and the goal of national unity with the goal of religious conversion to "particular plans for saving souls," *id.* at 640, 63 S.Ct. at 1186, it never said that nationalism is a religion or that saluting the flag is a religious gesture; rather, it asserted that "[n]ational unity as an end which officials may foster by persuasion and example is not in question," *id.* Justice Jackson's ringing phrases [1] in *Barnette* may speak to us as clearly and dramatically today as they did when they were written in 1943, but they do not support appellants.

█ Yet even if "nuclearism" could be classified as a religion, the district court rightly refused a hearing on the issue, for the property protection statute here does not have as its primary purpose the establishment of "nuclearism." This statute serves the Government's systemic interests in prohibiting sabotage of government property and insisting that any opposition to state policies or property ownership be expressed peacefully, through the political process. This general interest is apparent from the statute's broad scope: it is a crime to damage any government property, from public records, *see Chase v. United States*, 468 F.2d 141, 142 (7th Cir.1972); *United States v. Eberhardt*, 417 F.2d 1009, 1011 (4th Cir.1969), *cert. denied*, 397 U.S. 909, 90 S.Ct. 907, 25 L.Ed.2d 90 (1970); to government timber, *see United States v. Henderson*, 721 F.2d 276, 277 (9th Cir. 1983); and the Statue of Liberty, *see United States v. Bowe*, 360 F.2d 1, 5 (2d Cir.), *cert. denied*, 385 U.S. 961, 87 S.Ct. 401, 17 L.Ed.2d 306 (1966). Indeed, it is almost unimaginable that Congress could have intended such a broad statute—a statute having no nexus with the nuclear armament program other than that made by these appellants—to have even the subsidiary purpose of promoting "nuclearism." That

---

1. Nationalism is a relatively recent phenomenon but at other times and places the ends have been racial or territorial security, support of a dynasty or regime, and particular plans for saving souls. As first and moderate methods to attain unity have failed, those bent on its accomplishment must resort to an ever-increasing severity. As governmental pressure toward unity becomes greater, so strife becomes more bitter as to whose unity it shall be.... Ultimate futility of such attempts to compel coherence is the lesson of every such effort from the Roman drive to stamp out Christianity as a disturber of its pagan unity, the Inquisition, as a means to religious and dynastic unity, the Siberian exiles as a means to Russian unity, down to fast failing efforts of our present totalitarian enemies. Those who begin coercive elimination of dissent soon find themselves exterminating dissenters. Compulsory unification of opinion achieves only the unanimity of the graveyard.
   . . . .
   If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein. If there are any circumstances which permit an exception, they do not now occur to us.
   *Barnette*, 319 U.S. at 640–41, 642, 63 S.Ct. at 1186–87 (footnote omitted).

enforcing 18 U.S.C. § 1361 may aid in establishing "nuclearism" is surely incidental. *Cf. Lynch v. Donnelly,* —— U.S. ——, 104 S.Ct. 1355, 1364, 79 L.Ed.2d 604 (1984) (creche display's "benefit to one faith or religion or to all religions, is indirect, remote and incidental").

We hold that the enforcement of 18 U.S.C. § 1361 in this case did not have the primary purpose of advancing the alleged religion of "nuclearism." Thus we need not address appellants' argument that a statute that is constitutional in most circumstances can unconstitutionally advance or inhibit religion as applied in a particular situation.

Appellants' free exercise claim comes no closer to the mark. Appellants rely on teachings of the Bible commanding them not only not to kill and not to prepare for war, but also to act affirmatively to prevent killing and war. Thus they say that they were "required" to go to the SAC base on Thanksgiving Day, 1983, and there "symbolically disarm the nuclear weapons systems components." Citing *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), they claim that while the property protection statute may be facially neutral, in application it offends the constitutional requirement of neutrality by unduly burdening the free exercise of religion, requiring as it does their "silent complicity" in the preparation for war and total destruction of the earth and humanity. According to appellants, this restriction of religious liberty cannot be justified as being "essential to accomplish an overriding governmental interest" under *United States v. Lee,* 455 U.S. 252, 257–58, 102 S.Ct. 1051, 1055–56, 71 L.Ed.2d 127 (1982), because the governmental interest in "the preparation for mass killing through nuclear holocaust" is illegitimate.

Rather than embroil ourselves in the question whether acquiescence in the production of nuclear weapons conflicts with appellants' free exercise of religion, *cf. id.* at 257, 102 S.Ct. at 1055 (cautioning against judicial interpretation of scripture and the contours of religious faith), we find

the free exercise issue easily decided by an analysis of the governmental interest involved. Appellants seriously misconceive that interest: what is at stake here is not the nuclear armament program but the protection of government property. A more fundamental interest does not readily come to mind.

■ It is clear, of course, that no Supreme Court case supports the destruction of government, or another's, property on free exercise grounds. Quite the contrary. The Court has held time and again that the state can constitutionally prohibit or compel any action in order to avert "some substantial threat to public safety, peace or order." *Sherbert v. Verner,* 374 U.S. 398, 403, 83 S.Ct. 1790, 1793, 10 L.Ed.2d 965 (1963), because "the very concept of ordered liberty precludes allowing every person to make his own standards on matters of conduct in which society as a whole has important interests." *Yoder,* 406 U.S. at 215–16, 92 S.Ct. at 1533–34. Thus free exercise claims have had to yield before state interests in monogamy, *see Reynolds v. United States,* 98 U.S. 145, 161–67, 8 Otto 145, 161–67, 25 L.Ed. 244 (1878), in protecting children's health through blood transfusions, *see Jehovah's Witnesses v. King County Hospital Unit No. 1,* 390 U.S. 598, 88 S.Ct. 1260, 20 L.Ed.2d 158 (1968) (per curiam), *aff'g* 278 F.Supp. 488 (W.D.Wash.1967), in assuring mandatory and continuous participation in the Social Security system, *see United States v. Lee,* 455 U.S. at 258–60, 102 S.Ct. at 1055–57, in obtaining court testimony, *see Smilow v. United States,* 465 F.2d 802, 804–05 (2d Cir.), *vacated and remanded on other grounds,* 409 U.S. 944, 93 S.Ct. 268, 34 L.Ed.2d 215 (1972); *accord United States v. Huss,* 482 F.2d 38, 51 (2d Cir.1973), and in preventing the use of marijuana, *see United States v. Rush,* 738 F.2d 497, 512–13 (1st Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1355, 84 L.Ed.2d 378 (1985). Protecting government property, especially the supply of nuclear weapons, is essential to public peace, order, and safety: fortunately, while doing their $60,000 damage at

Hangar 101 appellants neither detonated any nuclear armament nor damaged a plane so as, perhaps by accident in the future, to effectuate such detonation. While less substantial state interests may be required to accommodate religious practices under the free exercise clause, *see, e.g., Sherbert v. Verner,* 374 U.S. at 408–09, 83 S.Ct. at 1796–97 (state interest in avoiding fraudulent claims of unemployment benefits); *Yoder,* 406 U.S. at 234, 92 S.Ct. at 1542 (state interest in compulsory school attendance after eighth grade), no plausible argument can be advanced why the Government must accommodate the religious beliefs of those who would destroy government property.

▮ We pass then to appellants' international law claims. No matter how convincing appellants' arguments may be that the production of nuclear weapons violates international law, we agree with *May,* 622 F.2d at 1009–10, that appellants should not be excused from the criminal consequences of acts of civil disobedience simply because the acts were allegedly directed at international law violations:

> We do not sit to render judgments upon the legality of the conduct of the government at the request of any person who asks us to because he happens to think that what the government is doing is wrong. He must be able to show some direct harm to himself, not a theoretical future harm to all of us that may or may not occur. To consider defendants' argument would put us in the position of usurping the functions that the Constitution has given to the Congress and to the President.... In the case before us, the defendants seek to mount [an] attack [on the Trident system] through the back door, by using it as a defense to a charge that they deliberately brought on themselves, one that bears no genuine relationship to the government program that they seek to attack.... The defendants deliberately flouted a valid law—a law that would be equally valid if there were no Trident system. They must take the consequences.

*See also United States v. Gillette,* 420 F.2d 298, 299 (2d Cir.1970) (draft evader lacks standing to challenge legality of war in Vietnam), *aff'd on other grounds,* 401 U.S. 437, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971). In short, because appellants can show only a "theoretical future harm to all of us," *May,* 622 F.2d at 1009, from the alleged international law violation, they would not have standing to bring an action challenging the nuclear weapons program; they cannot skirt the standing requirement by intentionally breaking an unrelated law in order to cast themselves as defendants rather than plaintiffs.

▮ Appellants assert, however, that "their purpose was not to disobey or disregard the law, but rather to uphold and enforce the Supreme law of the land—the Treaties and Charters to which the United States is a party." Like appellants' arguments based on the First Amendment, this argument fails to distinguish between two different and independent government actions: protection of property and production of nuclear weapons. Although their purpose may have been to uphold international law, their action disobeyed the wholly independent federal law protecting government property. *Cf. United States v. Mitchell,* 369 F.2d 323, 324 (2d Cir.1966) (inductee cannot challenge the legality of a war by refusing army service, because Congress's power to induct men into the army is independent of its authority to wage the war that the army is to fight), *cert. denied,* 386 U.S. 972, 87 S.Ct. 1162, 18 L.Ed.2d 132 (1967). Appellants cite no international law, and we are aware of none, even suggesting that an individual has the responsibility to correct a violation of international law by destroying government property. To the contrary, international law recognizes the sanctity of property, protecting a nation's property from destruction by another nation's agents, *see* N. Green, *International Law: Law of Peace* 206, 209 (2d ed. 1982), and offers other means to stop international law violations: "[i]nternational law presents nations with *institutions, processes, and norms* that permit respect to be manifested in relatively depoliticized atmospheres. *As such,* it is a valuable, although surprisingly unexplored, instrument available to those eager to

rescue the world from the nuclear trap," R. Falk, *The Role of Domestic Courts in the International Legal Order* 68–69 (1964) (emphasis added).

Moreover, as we stated in *United States v. Pinto-Mejia*, 720 F.2d 248, 259 (2d Cir. 1983), *modified on other grounds*, 728 F.2d 142 (2d Cir.1984), "in enacting statutes, Congress is not bound by international law.... If it chooses to do so, it may legislate [in a manner contrary to the limits posed by international law]." We do not suggest that the deployment of nuclear armament systems does violate international law, but merely that Congress has the power to protect government property by statute.

Judgment affirmed.