Mariela LEWIS and Alan Fishkin, individually and as guardians of Abigail Lewis–Fishkin, and Abigail Lewis–Fishkin, Plaintiffs,

v.

Thomas SOBOL, in his individual and official capacity as New York State Commissioner of Education, Dr. David Axelrod, in his individual and official capacity as New York State Commissioner of Health, Dr. Donald Batista, in his individual and official capacity as Superintendent of the Yonkers Public Schools, Lois Jameison, in her individual and official capacity as Assistant Superintendent of the Yonkers Public Schools, Lillian Mein, in her individual and official capacity as principal of Yonkers Pearls School No. 32, and the Yonkers Public School District, Defendants.

No. 88 Civ. 6434 (MEL).

United States District Court,
S.D. New York.

April 13, 1989.

Leon Friedman, Erica Horwitz, New York City, for plaintiffs.

Anderson, Banks, Moore, Curran & Hollis, Mount Kisco, N.Y., for defendants; Lawrence W. Thomas, James P. Drohan, of counsel.

LASKER, District Judge.

Mariela Lewis and Alan Fishkin instituted this action on behalf of their five year old daughter Abigail Lewis–Fishkin ("Abigail") to enjoin defendants Thomas Sobol, New York State Commissioner of Education; Dr. Donald M. Batista, Superintendent of the Yonkers Public Schools; the Yonkers Public School District and various other state and local education officials (collectively "Yonkers") from excluding Abigail from attending kindergarten because of her failure to undertake certain statutorily required immunizations. New York Public Health Law § 2164(9) (McKinney 1985) provides that a student whose parents' religious convictions are to the contrary shall be exempt from the immunization requirement.[1] Lewis and Fishkin argue that Yonkers denial of their § 2164(9) exemption request violated their First Amendment right to free exercise of religion. They also assert that Yonkers violated their right to Equal Protection under the Fourteenth Amendment by scrutinizing their religious views under a stricter standard than that applied to members of organized religions.

Because it was clear that Abigail would suffer irreparable harm if barred from attending school, this court granted a temporary restraining order enjoining Yonkers from excluding Abigail from the PEARLS (Program for Early And Rapid Learners) kindergarten at School No. 32. A bench trial on the merits was held and this memorandum constitutes the findings of fact and conclusions of law required by Fed.R.Civ.P. 52.[2] I find that Lewis and Fishkin's opposition to immunization stems from sincerely held religious beliefs; accordingly they are entitled to an exemption under § 2164(9); and that Yonkers has violated their First Amendment right to free exercise of religion by denying the exemption. A permanent injunction is ordered to permit Abigail to continue to attend school in the Yonkers Public School District.

I. FACTS

At trial Lewis, plaintiffs' primary witness, testified extensively about the development of her beliefs.[3] Born to a Jewish father and Catholic mother, Lewis attended the multidenominational Ethical Culture Sunday School in New York, where she studied a variety of religions. She also occasionally attended meetings at the Bahai church. Her studies and her parents' mixed religious backgrounds caused her to

---

**1.** New York Public Health Law § 2164(7) provides in relevant part:
  No principal, teacher, owner or person in charge of a school shall permit any child to be admitted to such school, or to attend such school in excess of fourteen days, without the certificate ... of the child's immunization against poliomyelitis, mumps, measles, diptheria and rubella.
  Section 2164(9) states:
  This section shall not apply to children whose parent, parents, or guardian are bona fide members of a recognized religious organization whose teachings are contrary to the practices herein required, and no certificate shall be required as a prequisite [sic] to such children being admitted or received into school or attending school.
  (footnote omitted)

**2.** Pursuant to Fed.R.Civ.P. 65(a)(2), trial on the merits was advanced and consolidated with the hearing of the application for a preliminary injunction.

**3.** Lewis and Fishkin have essentially the same beliefs. Trial Transcript ("T.") 125.

"develop a unique sense of my mixed spiritual heritage" and spurred her to develop her own distinctive religious beliefs. T. 6.

Like his wife, Fishkin displayed an early interest in studying religion. Raised in a Jewish family, he terminated his Hebrew lessons at age 12 because he did not find that Judaism was meeting his spiritual needs. T. 110. He studied Eastern religions and in 1976 began practicing transcendental meditation at various retreats, some of which lasted several months. T. 120–01. In 1980 Fishkin left his home in Montauk, New York and travelled to California in search of a fuller spiritual life. In Big Sur, California, Fishkin met a Native American named Joel who took him to Redwind, a 440 acre multitribal American Indian spiritual community located in a remote section of Los Padres National Forest near Santa Margarita, California. T. 126–27. Fishkin revisited Redwind several times during 1980 and 1981.

After Fishkin returned briefly to New York, where he met Lewis in May of 1981, the couple went to Redwind in 1982 and joined a community of 20 to 30 members of the Chumash, Navaho and Hopi tribes in religious prayer and worship of the Creator. These experiences had a profound effect on the couple. Lewis testified that:

> I felt that my need for a natural order ... had been met after living with the Indians in that way. I became very keenly aware of the spirituality of the land and the mountains and the physical aspect of our life out there. I felt a great kinship with the Indians who had lived on that land thousands of years ago and the way in which they lived, and I realized that this was the way that our creator intended us to live, in as simple, gentle, as respectful a manner as possible.

T. 10.

Lewis testified that as a result of her experiences at Redwind she gave "a great deal of thought as to how I would treat my body so that it would be as effective a physical vehicle for my spirit to come through." T. 10–11. While at Redwind she ate only seasonal, unadulterated food such as locally grown fruits, vegetables, grains and beans. She came to the belief—central to the disposition of this case—that physical illness represents

> a spiritual imbalance that manifests itself physically, whether it be a spiritual imbalance in my life or a spiritual imbalance as a result of other human activity. When we have physical symptoms it is my practice, our practice, to deal with physical symptoms as they need to be alleviated.

T. 12. Lewis and Fishkin's dietary and medical practices sprung from the beliefs they developed at Redwind.

On July 22, 1983, at San Luis Obispo Hospital near Redwind, attended by a midwife but without a doctor, Lewis gave birth to Abigail Lewis–Fishkin. "[T]o ensure that Abigail have as peaceful, as memorable, as beautiful a birth as [Lewis] could possibly arrange," T. 15, she was born in a dimly lit room with soft music playing and immediately bathed in warm water. Abigail received certain routine medical tests after birth. T. 66. Shortly after Abigail's birth Lewis and Fishkin left Redwind and moved back to New York to attend to Lewis' father, who had contracted Parkinson's disease. T. 19.

Lewis and Fishkin's beliefs with regard to nutrition and medicine, developed at Redwind, have governed Abigail's life. She eats a diet of seasonal foods and consumes few dairy products because, as Lewis testified, "I don't think that humans were built in a way by the creator to consume food that was meant for young cows." T. 20. Lewis and Fishkin also testified that they have treated Abigail's occasional illnesses by treating her physical symptoms and the spiritual imbalance they represented. Lewis and Fishkin do not believe in preventive medicine; they see medical intervention as required only when illness occurs and then they treat the spirit as well. Lewis testified:

> As I believe that illness is a physical manifestation of spiritual imbalance and disorder, I believe that I cannot anticipate spiritual imbalance and disorder. I cannot anticipate being ill. That would

mean anticipating spiritual atrophy or spiritual deterioration.... I anticipate being well ... I was born, my daughter was born, we are all born perfect beings ... complete beings ... microcosms of the universe, complete, perfect, and with an inherent stability and inherent healing abilities, and I believe that the proper way to treat the body is to maintain the health and perfectness that we were born with.

T. 25–26. Lewis stated that she did not oppose all injections but merely preventative vaccinations. Thus, Lewis would and has consented to injections of medicine to treat diseases that have already infected the body. However, as discussed in detail below, Abigail did receive a series of three preventative oral polio vaccinations. T. 28.

Abigail first attended the Knolls Nursery School in Riverdale, New York. When the school asked for an immunization certificate for Abigail, Lewis and Fishkin directed their attorney, James R. Filenbaum, to send a letter ("the Filenbaum letter")[4] to the director of the school requesting an exemption under § 2164(9). Attached to the letter was a statement of Lewis and Fishkin's religious beliefs ("the Lewis–Fishkin statement").[5] These submissions apparently satisfied the Knolls school and the issue was not raised again. T. 32. The following year Abigail attended the Presbyterian Church Nursery School in Riverdale. Lewis submitted the Filenbaum letter and the Lewis–Fishkin statement to the new school; that school also accepted these documents as satisfying the standards for exemption from the immunization requirement. T. 34.

In 1988 Abigail applied to and was accepted into the PEARLS program in the Yonkers public school system. After Lewis and Fishkin filled out registration forms for Abigail they gave a copy of the Filenbaum letter to the Yonkers school officials, who refused to register Abigail and referred the matter to the Yonkers Board of Education Office of Counsel. T. 35. On June 21, 1988, Lewis, Fishkin and Filenbaum met with James Drohan and Lawrence Thomas, counsel for Yonkers, and Richard J. Monaco, the director of secondary instruction, to discuss their claim of religious opposition to Abigail's immunization. T. 36–37.

On July 1, 1988 Monaco issued findings of fact and a recommendation that Abigail not be allowed exemption from immunization. Monaco relied on several facts that he felt were inconsistent with Lewis and Fishkin's stated beliefs, namely that Abigail had previously received an oral polio vaccination, as well as antibiotics and other preventive medical treatment. The findings stated:

> I conclude that the parents' claim of a sincere religious basis to their objection to immunization is not credible. It may be in fact that the parents' objection to immunization is a matter of personal preference as opposed to religious doctrine, but it is not necessary for the Board to reach that specific question. There simply has been no evidence that the ingestion of medicine is *per se* proscribed by the parents' religion—otherwise, the oral vaccination would not have been sought out by the parents.
>
> ... [I]f the tenets of the parents' religion are sufficiently relaxed to allow them to react in an *ad hoc* fashion, to each medical situation where ingestion of foreign substances (such as vaccination) is indicated, it is difficult to perceive how that religion could automatically be violated by the vaccination requirement.[6]

Batista, Yonkers Superintendent of Schools, approved the recommendation and

---

4. Plaintiffs' Exhibit 1 (letter from James R. Filenbaum to Alice Kako, Director, Knolls Nursery School, Inc. (Mar. 20, 1989)).

5. Plaintiffs' Exhibit 2 ("The Religious Beliefs of Mariela Lewis and Alan Fishkin"). The beliefs that Lewis and Fishkin developed at Redwind are not based on particular sacred texts or scriptures. T. 84.

6. Plaintiffs' Application for a Temporary Restraining Order and Preliminary Injunction at Exhibit A (Sep. 16, 1988) ("Findings and Recommendation With Regard To Claim For Exemption From Immunization Pursuant To Public Health Law § 2164(9)," submitted by Richard J. Monaco (July 1, 1988)).

refused to grant the exemption. Lewis and Fishkin then sent two letters to the Yonkers Board indicating that they nevertheless planned to register Abigail at the Yonkers school in September.

Fishkin and Lewis then sought a medical exemption from immunization under N.Y. Pub.Health L. § 2164(8).[7] On August 10, 1988 they submitted to Superintendent Batista a certificate from Kay S. Lawrence, M.D. stating that immunization would be harmful to Abigail's health.[8] Batista responded by letter on August 25:

> [T]he documentation and information supplied to date is legally insufficient for the School District to grant [Abigail] a medical exemption.... Dr. Lawrence has refused to discuss or elaborate on the basis for her opinion, and [you] have refused to authorize Dr. Lawrence to discuss the matter with us further. Further, under Education Law Section 901 ... the District is required to perform medical examination of pupils as may be essential.
>
> Accordingly ... the District will not allow Abigail to enter Kindergarten until such time as satisfactory medical documentation including vaccinations, is supplied or until Abigail is examined by a physician of the District's choosing to ascertain the nature of her medical condition which prevents immunization and to see if that condition presents a danger to the health and safety of others at school.[9]

Fishkin and Lewis then wrote to Batista on September 3 that they believed that the opinion of Dr. Lawrence was legally sufficient to entitle Abigail to the medical exemption and that they considered Batista's letter a denial of their request.[10] They also stated that they did not waive their request for a religious exemption under § 2164(9). On September 5 Fishkin and Lewis again wrote to Batista to assert that Abigail would attend school on the first day of class, September 8, and that if Yonkers barred her they would take appropriate legal action.[11]

On September 8, 1988, Lewis and Fishkin arrived at school fifteen minutes early to ensure Abigail's attendance. Lillian Mein, the school principal, and Lois Jameison, the assistant principal, met them at the entrance to the classroom; Jameison announced that Abigail could not be admitted until the question of her immunizations had been settled. After Fishkin briefly reiterated the family's religious objections, Mein put her hand across the doorway and asked Jameison to summon the police. Officer George Wilcha of the Yonkers Police Department arrived, pulled Fishkin back from the classroom doorway, and explained that, without an immunization certificate, Abigail could not attend class. After some discussion Lewis and Fishkin concluded that there was no hope of Abigail attending school that day and went home. T. 44–45. Abigail was admitted to kindergarten on September 19, 1988, pursuant to this court's grant of a temporary restraining order, after she was examined by a school physician.

Lewis and Fishkin argue that Yonkers violated their First Amendment right to free exercise of religion by denying the sincerity of their religious beliefs and refusing to grant Abigail an exemption under § 2164(9). In addition, plaintiffs contend that their exemption request was reviewed by Yonkers with greater scrutiny than in the case of parents who are members of organized religions in violation of the Fourteenth Amendment right to equal protection of the law.

---

7. Section 2164(8) states:

> If any physician licensed to practice medicine in this state certifies that such immunization may be detrimental to a child's health, the requirements of this section shall be inapplicable until such immunization is found no longer to be detrimental to the child's health.

8. Plaintiffs' Exhibit 4 at App. A.

9. Plaintiffs' Exhibit 4, App. G at 1–2 (letter from Donald M. Batista to Mariela Lewis and Alan Fishkin (Aug. 25, 1988)).

10. Plaintiffs' Exhibit 4 (letter from Mariela Lewis and Alan Fishkin to Donald M. Batista (Sep. 3, 1988)).

11. Plaintiff's Exhibit 5 (letter from Mariela Lewis and Alan Fishkin to Donald M. Batista (Sep. 5, 1988)).

## II. ABSTENTION

As a threshold matter Yonkers argues that this case presents ambiguous questions of state law and that accordingly under the principles of *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941) the court should abstain from deciding the case. Specifically, Yonkers asserts that no state courts have interpreted the scope of § 2164(9), since *Sherr v. Northport–East Northport Union Free School Dist.*, 672 F.Supp. 81, 91 (E.D.N.Y.1987) held that the clause in § 2164(9) requiring parents who seek an exemption be "bona fide members of a recognized religious organization" was unconstitutional. The state did not appeal *Sherr* and thus § 2164(9) now includes a general exemption for any person who opposes immunization of their child based on a sincerely held religious belief. *Mason v. General Brown Central School Dist.*, 851 F.2d 47, 54 (2d Cir.1988); *see Frazee v. Illinois Dep't of Employment Security*, — U.S. ——, 109 S.Ct. 1514, 103 L.Ed.2d 914 (1989) (holding that free exercise clause protection extends to all with religious beliefs, not just members of organized religions). According to Yonkers, it follows that the scope of § 2164 is an unsettled question of state law that the state courts must resolve before this court addresses the merits of this case. Yonkers contends that there is now a question of law as to what amount of proof school districts can require from those claiming exemptions under § 2164(9) who are not members of organized religions.

Under *Pullman* abstention doctrine, where unsettled questions of state law may obviate the need to address federal constitutional issues, a court should abstain from decision until state courts have had an opportunity to determine the state law questions at issue.

> However, when a state statute "is not fairly subject to an interpretation which will avoid or modify the federal constitutional question, it is the duty of a federal court to decide the federal question...." Thus, "abstention is not to be ordered unless the state statute is of an un-

certain nature, and is obviously susceptible of a limiting construction."

*Alliance of Am. Insurers v. Cuomo*, 854 F.2d 591, 601–02 (2d Cir.1988) (citing *Zwickler v. Koota*, 389 U.S. 241, 251, 88 S.Ct. 391, 397, 19 L.Ed.2d 444 (1967)).

In *McRedmond v. Wilson*, 533 F.2d 757, 761–2 (2d Cir.1976) (citations omitted), the court set forth three prerequisites to the application of *Pullman* abstention:

> [T]hat the state statute be unclear or the issue of state law be uncertain, that resolution of the federal issue depend upon the interpretation to be given to the state law, and that the state law be susceptible of an interpretation that would avoid or modify the federal constitutional issue....
>
> [W]here a state statute is unambiguous the court must perform its adjudicative duty and has no right to abstain merely because a state court decision might render a federal adjudication unnecessary.

In *McRedmond* the Second Circuit rejected the argument that the state should be given the first opportunity to establish the proper procedure where plaintiffs challenged the constitutionality of the procedural requirements of state law.

> Resolution of [the] issue [in this case] does not turn upon construction of any unclear state statute ... the interpretation of which might avoid or modify the federal constitutional issue.... Application of the key statutory clause does not require intricate or penetrating statutory interpretation best left to the state.... [T]he question [in this case] is one of fact rather than of statutory interpretation.... We have no reason to believe that the federal court is any less equipped to engage in this factual inquiry than is its counterpart at the state level.

*Id.* at 762.

None of the three *McRedmond* requirements for abstention is satisfied here. First, the state statutory provision at issue, § 2164(9), is clear. Prior to *Sherr* and *Mason*, the state courts that had considered the question had consistently ruled

that the "recognized religious organization" clause of § 2164(9) was unconstitutional. *See Mason,* 851 F.2d at 50 (citing cases); *Sherr,* 672 F.Supp. at 86 (same). That federal courts have now held the clause unconstitutional does not make the state law on point any less settled but merely confirms the uniform line of state court decisions interpreting § 2164(9). This case merely involves the First Amendment implications of Yonkers' application of settled state law.

Moreover, the question of what level of proof is required under § 2164(9) for a party who is not a member of an organized religion is for this court, rather than a state court, because the underlying issue involves a federal constitutional claim: whether Yonkers improperly violated the First Amendment rights of Lewis and Fishkin by denying their request for a religious-based exemption from immunization under § 2164(9). Yonkers claims, for example, that § 2164(9) as drafted requires exemption only where the "teachings" of bona fide members of a religious group are contrary to immunization and that, because there are no such formal teachings here, the evidentiary procedure for determining exemptions is now (after *Sherr*) an unclear question for state courts to determine. However, because the claim is a federal constitutional claim, it is particularly appropriate for this court to determine the required quantum of proof. Although Lewis and Fishkin are not members of an organized religion, they have offered written as well as testimonial evidence which goes to the nature of the sincerity of their religious beliefs. The court will consider all the evidence in determining whether or not Lewis and Fishkin's beliefs are sincerely held and religious in nature.[12]

Second, this court's determination of the level of proof required does not depend on state interpretation simply because the

state courts or the Commissioner of Education might differ. Finally, even if the quantum of proof were considered a state law question, this court would ultimately consider the constitutional claim. *See Hawaii Housing Authority v. Midkiff,* 467 U.S. 229, 237, 104 S.Ct. 2321, 2327, 81 L.Ed. 2d 186 (1984) ("[T]he relevant inquiry is not whether there is a bare, though unlikely, possibility that state courts *might* render adjudication of the federal question unnecessary.").

In sum, because the meaning of the state statute in this case is not uncertain, abstention would be inappropriate.

### III. DEFERENCE

■ Yonkers next argues that this court should defer to Yonkers' administrative determination that Lewis and Fishkin's opposition to immunization was not based on sincerely held religious beliefs. In support of its position Yonkers cites *Hazelwood School District v. Kuhlmeier,* 484 U.S. 260, 108 S.Ct. 562, 571, 98 L.Ed.2d 592 (1988), in which the Court stated that "the education of the Nation's youth is primarily the responsibility of parents, teachers, and state and local officials, and not of federal judges." *Hazelwood* held that a court should defer to a school board's determination that some speech may disrupt the classroom. However, *Hazelwood* is not a paradigm for this case, which does not involve questions of education but rather a First Amendment claim about which the school board has no special expertise.

### IV. THE RELIGIOUS QUALITY OF LEWIS AND FISHKIN'S BELIEFS

■ Considerable authority exists as a guide in determining whether Lewis and Fishkin's opposition to immunization of Abigail stems from sincerely held religious, as opposed to scientific, views. That Lewis and Fishkin are not members of an orga-

---

**12.** Yonkers cites *Catlin v. Ambach,* 820 F.2d 588 (2d Cir.1987), which held that abstention was appropriate where there was a controlling issue of state law regarding the interpretation of a state statute that no state court had yet considered. *Id.* at 591. Here there is no controlling issue of state law; several courts have al-

ready ruled on the constitutionality of § 2164(9). The controlling question in this case is whether Yonkers' application of § 2164(9) in this case was constitutional. That is a mixed question of law and fact that this court can and should resolve. *Catlin* is inapposite.

nized religion does not preclude them from protection under the Free Exercise clause if their beliefs are in fact religious.

> Undoubtedly, membership in an organized religious denomination ... would simplify the problem of identifying sincerely held religious beliefs, but we reject the notion that to claim the protection of the Free Exercise Clause, one must be responding to the commands of a particular religious organization.

*Frazee v. Illinois Dep't of Employment Security,* — U.S. —, —, 109 S.Ct. 1514, 1517, 103 L.Ed.2d 914 (1989). *See also United States v. Seeger,* 380 U.S. 163, 178, 85 S.Ct. 850, 860, 13 L.Ed.2d 733 (1965) (the term "religious training and belief" in a congressional statute not limited to "those believing in a traditional God").[13] In *International Soc'y for Krishna Consciousness, Inc. v. Barber,* 650 F.2d 430, 440 (2d Cir.1981) (footnote omitted), the Second Circuit attempted a workable definition of religion under the First Amendment:

> The *Seeger* Court cited with approval the use of a functional, phenomenological investigation of an individual's "religion" advocated by liberal theologian Paul Tillich. In the absence of a requirement of "God," this approach treats an individual's "ultimate concern"—whatever that concern be—as his "religion." A concern is "ultimate" when it is more than "intellectual." [Note, *Toward a Constitutional Definition of Religion,* 91 Harv.L. Rev. 1056, 1075 & n. 108 (1978).] A concern is more than intellectual when a believer would categorically "disregard elementary self-interest ... in preference to transgressing its tenets." *United States v. Kauten,* 133 F.2d 703, 708 (2d Cir.1943) (A. Hand, J.)

*See also United States v. Allen,* 760 F.2d 447, 450 (2d Cir.1985) ("[The *Krishna* court's] expansive definition of religion has been developed primarily to protect an individual's free exercise of religion, recognizing that an individual's most sincere beliefs do not necessarily fall within traditional

religious categories."). Yonkers argues that Lewis and Fishkin's beliefs are personal, philosophical, and scientific but not religious. Yonkers asserts that under the *Krishna Consciousness* test, Lewis and Fishkin's views are not religious because they have not "categorically disregard[ed] elementary self-interest ... in preference to transgressing [the] tenets [of their views]." *Krishna Consciousness,* 650 F.2d at 440.

Specifically, Yonkers argues that the fact that Lewis and Fishkin permitted Abigail to receive a polio vaccine indicates a lack of categorical disregard for their self-interest. However, Lewis testified that Abigail received this vaccination only because Lewis finally succumbed to "the fear, the intimidation, the pressure that my immediate family and Alan's immediate family were constantly [applying]." T. 28. Alan Fishkin's mother, Roslyn Fishkin, testified impressively about her campaign to have Abigail vaccinated for polio, irrespective of the views of her son and daughter-in-law.

> You better believe I badgered her. I felt very strongly that Abigail should have polio vaccine, that polio was a dread disease, and that I wanted my grandchild protected against it, and I really did a Jewish mother guilt trip on Mariela. I am not necessarily proud of it because I caused her to go against her beliefs.... I really relentlessly persuaded her.

T. 114. Moreover, Lewis permitted Abigail to be vaccinated for polio without telling her husband, who was angered after he learned of the incident. This isolated event admittedly went against Lewis and Fishkin's beliefs, but does not establish that Lewis and Fishkin would not, on the whole, categorically disregard their self-interest rather than transgress their beliefs. Indeed, the record in this case indicates a consistent effort by Lewis and Fishkin to sustain and live out their beliefs in disregard of their self-interest in procuring vaccination against disease.

---

**13.** Although *Seeger* was decided on statutory and not constitutional grounds, the Court's de-

termination is nonetheless a helpful guide.

Yonkers is correct that the Lewis and Fishkin Statement does not explicitly include opposition to immunization.[14] However, such opposition is certainly consistent with the Statement. Lewis and Fishkin state:

> [H]umans have been provided with inherent strength, stability and self healing abilities.
>
> .    .    .    .    .
>
> We therefore have come to believe, in a manner respectful of others, that we cannot consume live or dead organisms, or their byproducts, for any purpose.[15]

Lewis and Fishkin's beliefs, upon which their opposition to immunization is based, stem from "ultimate concerns" that are clearly more than intellectual in nature. Lewis and Fishkin have a distinctive lifestyle, based on their belief in a creator, that has exposed them to scorn and pressure from nonbelieving family and school officials.

The facts in this case are clearly distinguishable from those in *Mason v. General Brown Cent. School Dist.*, 851 F.2d 47 (2d Cir.1988), in which the court affirmed the denial of a request for a § 2164(9) exemption because plaintiffs' alleged religious belief against immunization was admitted to be primarily "biological." 851 F.2d at 51. The Masons belonged to the Universal Life Church, an organization dominated by chiropractors, that the court found "appears to exist for only two purposes: to provide a tax dodge for its leaders, and to give 'religious' legitimacy to the chiropractic ethics of its members." *Id.* at 53 (citation omitted). The court did not doubt that the Masons' convictions were strongly held but characterized them as "philosophical and personal." *Id.* at 52.

Here there is no evidence that Lewis and Fishkin's beliefs are predominantly based on scientific or biological considerations. Lewis and Fishkin do not oppose medical intervention *per se;* rather, they believe in medicine only when physical symptoms exist, that manifest an "imbalanced spirit."

While they may share the Masons' view that "health comes from within,"[16] their developed views of the creator and individual spiritual perfection are fairly characterized as religious.

## V. WHETHER LEWIS AND FISHKIN'S BELIEFS ARE SINCERELY HELD

Are Lewis and Fishkin's views sincere? The court of appeals has stated:

> Sincerity analysis seeks to determine the subjective good faith of an adherent.... The goal, of course, is to protect only those beliefs which are held as a matter of conscience.... [I]t is frequently difficult to separate this inquiry from a forbidden one involving the verity of the underlying belief.... Therefore, this analysis is most useful where extrinsic evidence is evaluated. For example, an adherent's belief would not be "sincere" if he acts in a manner inconsistent with that belief, or if there is evidence that the adherent materially gains by fraudulently hiding secular interests behind a veil of religious doctrine.

*Krishna Consciousness,* 650 F.2d at 441 (citations omitted).

Lewis and Fishkin's belief in a creator and in maintaining spiritual perfection pervades their life, especially their diet and methods for treating illness. Lewis's testimony was sincere, direct and very credible. She stated:

> Because I spiritually do not anticipate illness, as when I am ill it is an indication to me that I have become spiritually imbalanced, that I have not been following my path, and the same for my child. I therefore cannot anticipate becoming more spiritually imbalanced. I have to strive for spiritual evolvement, spiritual growth, and strive for spiritual perfection.

T. 48. Lewis and Fishkin thus oppose immunizations and all other routine preventive medical procedures, based on their be-

---

**14.** Plaintiffs' Exhibit 2.

**15.** Plaintiffs' Exhibit 2.

**16.** *Mason,* 851 F.2d at 51.

lief that we all exist in spiritual perfection. T. 27. They do not oppose injections or other forms of medical treatment for manifest illnesses, because symptoms of disease according to Lewis and Fishkin, reflect spiritual and physical imbalance. T. 27–28, 154–55. Only immunizations and other forms of preventive medicine are anathema to Lewis and Fishkin.

Yonkers argues that several actions by Lewis and Fishkin are inconsistent with their beliefs and prove that they do not sincerely oppose Abigail's immunization on religious grounds but rather for scientific reasons. The alleged inconsistent act of permitting Abigail to be vaccinated for polio was credibly explained by Lewis. *See* section IV above. That Abigail received medical treatment on several other occasions does not, in the particular circumstances of the respective occasions, belie the sincerity of her parents' opposition to immunization on religious grounds. For instance, it is irrelevant that Abigail was subjected to certain routine medical tests after birth and had silver nitrate put in her eyes because these procedures were administered without the knowledge of her parents. Other instances in which Abigail received medication were in response to symptoms of illness and were accompanied by efforts to treat Abigail's spirit.

Similarly, Lewis and Fishkin's pursuit of a medical exemption for Abigail, following Yonkers' denial of their request for a religious exemption, was a logical pursuit of an alternative legal solution to the problem that faced the family; it did not, as Yonkers argues, indicate that their opposition to immunization was based on medical or scientific, rather than religious, beliefs. Moreover, occasional deviation from one's religious practice does not necessarily negate the sincerity of religious beliefs.

> A person need not rigidly adhere to each and every tenet of his faith in order to qualify as a sincere believer. Religions, as most things, are practiced in degrees of adherence.... Plaintiffs must be free to follow those religious principles they deem most important and no inference of insincerity may be found to flow from their failure to follow the whole

gamut of their religion's tenets. Were it otherwise, any deviation from established religious norms would brand the schismatic a heretic. It is not for the Court to determine how devout a follower [an applicant for exemption] is; rather, it need only determine that a sincere religious belief underlies their present claims.

*Allanson v. Clinton Cent. School Dist.,* No. 84–174, slip. op. at 15 (N.D.N.Y. May 7, 1984).

The facts of this case are clearly distinguishable from *Sherr v. Northport–East Northport Union Free School Dist.,* 672 F.Supp. 81, 91 (E.D.N.Y.1987), in which the court found that plaintiffs Alan and Claudia Sherr's views were religious but were not sincerely held and therefore did not merit an exemption under § 2164(9). The Sherrs had previously submitted an affidavit to the school board requesting exemption from the immunization requirement on the basis of their membership in a health organization that "rejects the theory and use of compulsory inoculations under any circumstances, as a matter of science, safety, and conscience." 672 F.Supp. at 94. Moreover, Paul Sherr admitted that he had joined a religious organization solely for the purpose of obtaining an exemption for his son and that he had paraphrased a statement of religious belief used by a successful plaintiff in another exemption case. *Id.* at 96.

In contrast, the court in *Sherr* also found that plaintiffs Louis and Valery Levy manifested "complete sincerity" in their religious beliefs and were therefore entitled to an exemption:

> The Levy's conception of human existence and the physical world seems to pervade their whole way of life, including their eating habits and methods of combatting illness.... It is a fundamental tenet of [the Levy's religion], for instance, that "the integrity of the body be maintained" since "our bodies are the temple of our being." ... Louis Levy, moreover, greatly impressed the Court with the seriousness with which he has contemplated the foundations of his reli-

gious beliefs and their implications for his family's daily life.... *Id.* at 96–97. In the instant case, Lewis and Fishkin practice their beliefs in a manner similar to the Levys and distinct from the Sherrs. Unlike the Sherrs, Lewis and Fishkin only applied for a medical exemption as a last minute alternative after seeking a religious exemption. Moreover, as the Levys impressed the *Sherr* court with the degree to which they had considered and applied their religious beliefs, Lewis and Fishkin persuasively articulated their religious beliefs and demonstrated that they daily apply their views of spiritual perfection in their dietary and medical practices.

The evidence, particularly the credible and convincing testimony of Mariela Lewis, establishes without question that a sincere religious belief underlies Lewis and Fishkin's opposition to immunization and therefore Abigail is exempt under § 2164(9).

■ There is no Fourteenth Amendment Equal Protection violation in this case because there is no evidence that Yonkers subjected Lewis and Fishkin's application for a religious exemption to greater scrutiny than an application of members of an organized religion.

## VI. DAMAGES

■ Fishkin and Lewis seek nominal and emotional distress damages arising from the violation of their First Amendment rights. Yonkers argues that, for two reasons, no damages should be awarded. First, Abigail would have been admitted to kindergarten after her parents applied for a medical exemption to the immunization requirement,[17] had they assented to Yonkers' request that a physician of Yonkers' choice examine Abigail. That Fishkin and Lewis chose not to pursue this path does not bar their claim for damages arising from Yonkers' refusal to grant a religious-based exemption and the resulting physical confrontation between the parties on the first day of school. Nor would an application for exemption to the Commissioner of

Education necessarily have prevented the confrontation of September 8.

■ Second, Yonkers asserts qualified immunity from money damages, arguing that its actions were reasonable based on legal rules clearly established at the time those actions were taken. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) (holding that government officials "generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known"). Qualified immunity, however, does not apply to officials in their official capacities or to school districts. *Owen v. City of Independence*, 445 U.S. 622, 638, 100 S.Ct. 1398, 1409, 63 L.Ed.2d 673 (1980) ("There is no tradition of immunity for municipal corporations."); *Lewis v. Harrison School Dist. No. 1*, 805 F.2d 310, 318 n. 8 (8th Cir.1986) ("[T]he verdict against defendant officials in their official capacity ... is simply a finding that the school district is liable. The doctrine of qualified immunity is not a defense to the school district's liability") (citations omitted), *cert. denied*, 482 U.S. 905, 107 S.Ct. 2481, 96 L.Ed.2d 374 (1987). In this case, defendant Yonkers Public School District is therefore liable, even if those government officials sued in their individual capacities are not.

The evidence of damages in this case consists solely of the testimony of Lewis and Fishkin regarding the emotional distress that they and Abigail suffered following the confrontation with Yonkers officials and the exclusion of Abigail from school No. 32 on the first day of class. Lewis testified that she felt "embarrassed [and] mortified that Abigail's teacher, classmates ... and parents could be witness to such a thing. I felt frightened." T. 45. According to Lewis, Abigail was

absolutely crushed ... She cried and she kept on asking ... why did it happen, why the school people had sent police officers, why everyone at school appeared to be so crabby and upset and

**17.** *See* Plaintiffs' Exhibit 4.

why everyone had such scary looks on their faces and when she would be allowed to go to school.

T. 46. Fishkin testified that, after leaving the school, "I felt like a Jew in Nazi Germany ... [b]ecause I felt I was being attacked and harassed because of my personal religious beliefs." T. 134. Based on this sincere testimony, plaintiffs are entitled to an award of damages in the amount of $1,000 for the limited emotional distress they suffered as a result of the violation of their First Amendment right.

*   *   *   *   *   *

For the reasons discussed above, Lewis and Fishkin's motion for a permanent injunction barring Yonkers from excluding Abigail Lewis–Fishkin from school is granted. Plaintiffs are awarded damages in the amount of $1,000 for Yonkers' violation of their First Amendment right to free exercise of their religion.

Submit judgment on notice.