OPINION OF THE COURT
Gloria M. Dabiri, J.
By petition dated January 24, 1991 it is alleged that the subject child Christine M., age 3 (date of birth Sept. 26, 1988), is a neglected child within the meaning of Family Court Act § 1012 (i) in that "the respondent [Neil M.] refuses to have Christine immunized in accordance with the recommendations of a physician at Brookdale [sic] Hospital. The doctor’s recommendation was predicated on an outbreak of a measles [or] epidemic which places Christine in danger of contracting the disease in the absence of an immunization. The respondent refuses to have Christine immunized although the respondent’s three (3) older children are currently immunized against measles.” The subject child was paroled to the care of her nonrespondent mother, Amy M., pending disposition.
The matter proceeded to fact finding on May 20, 1991 and continued on August 6, 1991, December 10, 1991, January 15 and 22, 1992, February 5, 19 and 26, 1992, and March 30, 1992. Testifying on behalf of the Commissioner of Social Services (CSS) were Dr. Nassef Elias Dawlabani, a pediatrician, and Amy M. The respondent called Dr. Philip Incao, a general practitioner, Dr. William Holub, a clinical biochemist, Stephan Burch, an employee of the Child Welfare Administration, and the respondent. Dr. Louis Z. Cooper, an expert in both pediatrics and in infectious diseases, testified on behalf of the Law Guardian.
Thereafter, the matter was adjourned to July 30, 1992 for the submission of memoranda of law and for decision. The court made a finding of neglect, in a decision rendered from the Bench, and the matter was adjourned for a report by CSS and for a dispositional hearing. At the dispositional hearing, held on October 8, 1992, counsels relied upon the evidence at the fact-finding hearing and presented oral arguments. Thereafter, the court dismissed the petition pursuant to Family Court Act § 1051 (c). The reasons for the court’s finding of neglect and order of disposition are set forth herein.
I. FINDING OF FACT
The respondent Neil M. and nonrespondent Amy M. are the natural parents of four children: Joel born in 1980, Amanda *6 born in 1982, Timothy born in 1984 and Christine born September 26, 1988. The M. family resides in an apartment on Church Avenue in Brooklyn, a busy inner-city neighborhood with both commercial and residential usages. The three older M. children attend public school. While the M. parents are at work Christine is regularly placed in the care of a private babysitter who also cares for six or seven other children.
In August of 1990 Christine was admitted to Brooklyn Hospital for what was believed to have been an accidental ingestion of rat poison. The M. family had had a problem with rodents in the apartment, and the poison was left on a dresser in Mr. and Mrs. M.’s bedroom. While Christine was hospitalized doctors recommended to her parents that she be vaccinated against measles due to an existing measles outbreak in New York City.
In late 1989 and early 1990 New York City began to experience a serious measles outbreak or epidemic. Through December of 1990 approximately 2,500 cases and eight measles associated deaths were reported to State and Federal agencies. By May of 1991 the outbreak had resulted in 5,600 reported cases and 19 reported deaths in New York City alone. The outbreak occurred predominantly among unvaccinated preschool age children in low income, densely populated areas. More than 70% of the cases were reported from Brooklyn and the Bronx.[1] There was, therefore, a high probability that an unvaccinated three-year-old child, such as Christine, would contract measles.
In order to control the outbreak of this highly contagious disease, both the New York City and State Health Departments recommended that an additional "emergency” measles vaccine be given to infants at six to 11 months of age, in addition to the regular two-dose measles immunization at 12 months and again before entering school at about four years of age. The two year outbreak of measles has now ended. It is not possible to predict when the next outbreak will occur.
Most children who contract measles merely suffer high fever, cough, red eyes, runny nose and skin rash. However, some develop pneumonia, a complication of measles which can cause permanent lung damage, chronic and recurring infection or death. Another serious complication of measles infec *7 tian is encephalitis, an inflammation of the brain. Approximately 15% of patients with measles related encephalitis die and another 25 to 35% have permanent neurological damage. Measles infected children may also develop subacute sclerosing panencephalitis (SSPE) which causes irreversible neurological damage, mental retardation and seizures, and from which there is little chance of recovery. The serious complications and fatalities associated with measles occur most often in young children and in the elderly.[2]
In the opinion of both pediatricians, Dr. Cooper and Dr. Dawlabani, the measles vaccines currently in use are safe and effective.[3] The measles vaccine causes mild side effects, such as low grade fever and malaise, and is not life-threatening.[4] Dr. Cooper indicated that in his 30 years of experience the measles vaccine had never caused a fatality. While he conceded that, theoretically, the vaccine could possibly be fatal, such a situation, in his estimation, would be so "exquisitely rare” that he could not even describe the circumstances in which it might occur. According to Dr. Cooper, since the vaccine became available in the 1960’s, approximately 200,000,000 chil *8 dren have received it. The American Academy of Pediatrics, the United States Public Health Service, as well as national and international health organizations, recommend that children be vaccinated against measles. According to Dr. Dawlabani, 95% of vaccinated children receive life-long immunity against measles, while the remaining 5% receive some immunity. Should those among the 5% contract measles, the infections, because of the vaccinations, would be mild. In the opinion of both pediatricians, because the benefits of the measles vaccine outweigh any reaction to the vaccine and because the risk of her contracting the potentially debilitating measles disease was great, Christine, a healthy three year old, should have been vaccinated.
Following Christine’s admission to the hospital in August of 1990, Dr. Dawlabani spoke with respondent Neil M. and told him why Christine should be immunized. Thereafter, a report of suspected child abuse or maltreatment was filed by the hospital social worker alleging that respondent was "unwilling to allow [his child] to be immunized for personal/religious reasons.” Caseworker Stephan Burch made several visits to the M. home between August and December of 1990 in an attempt to "work with the family” towards having Christine immunized. The M. home was clean and adequately furnished and the children appeared well cared for. Mrs. M., who believes Christine should be immunized, had Christine vaccinated against polio, diphtheria, pertussis and tetanus (DPT) without the respondent’s knowledge. The following day respondent learned of this and discussed with his wife the legal exemption from vaccinations based upon a parent’s religious objections.
The respondent also met with Mr. Burch at CSS offices in early August and told Burch that he believed the measles vaccine to be unhealthy, that the vaccination was unnecessary in the United States and that vaccination is against his religious beliefs. He advised Burch that he had considered the legal issues and had obtained copies of the law concerning vaccinations. He showed Burch written material in support of his position that the measles vaccine was unnecessary and indicated that he would be willing to go to court if necessary. Thereafter, respondent spoke with Dr. Dawlabani at a meeting arranged by caseworker Burch. Mr. M. told the doctor that having Christine immunized was against his religious beliefs and asked the doctor questions concerning the side effects and effectiveness of the vaccine.
*9 In 1973 the respondent had become a Christian associated with the Church of God Seventh Day. Prior to 1973 the respondent was a self-described, nonpracticing Catholic. In 1977, Mr. M. became an evangelist in Guyana for the Church of God Seventh Day. He was in Guyana for approximately two years. His duties included marriage counseling, attending at funerals and other duties of a pastor. Before going to Guyana in 1977 he was revaccinated. The Church of God Seventh Day does not have any doctrines or tenets against vaccinations, nor has the pastor of the M.’s Church taken a position against vaccines. When he testified on February 5, 1992, the respondent had been "boycotting” his church for six months because of the Church’s failure to address certain subjects which he believes are important.
Mr. and Mrs. M. continued to be associated with the Church of God Seventh Day after their marriage in 1979. The three older M. children, following their births in 1980, 1982 and 1984, were immunized against measles and other childhood diseases with the respondent’s approval. None of the children suffered any side effects from the vaccines other than a fever lasting about one day. The respondent was the parent who generally took the children to doctors when they were ill. On one occasion Amanda received a penicillin injection for an infection and on another she was prescribed cough medicine for a cold. Joel was treated by a physician for asthma with a substance which he was required to inhale. Timothy who had meningitis was hospitalized for a significant period in 1985 or 1986.
In the 1980’s the respondent began to educate himself regarding the relationships of food to disease, and began to make changes in his and his family’s diet and health care. These changes included abstinence from certain dairy products. He is a believer in well health care which includes not only maintaining good eating habits and hygiene, but removing toxins from the environment. Some time prior to Christine’s birth Mr. M. heard a radio presentation by Sharon Kimmelman. Ms. Kimmelman is associated with a group opposed to vaccinations called Vaccinations Alternatives. Shortly after Christine’s birth, respondent discussed with his wife his concerns about having Christine inoculated. According to Mrs. M., the discussion "came up as a part of a series of changes respondent made in his personal life and wanted the children also to adhere [to]”. The respondent asked that, prior to having Christine immunized, his wife discuss with the *10 pediatrician the side effects of vaccines and the possibility that Christine would develop the disease as a result of receiving the vaccine. The respondent expressed concern regarding the vaccines’ toxicity. Mrs. M., at her husband’s urging, listened to Ms. Kimmelman on the radio, spoke with Ms. Kimmelman and reviewed literature from her organization. She also spoke with Christine’s pediatrician. Thereafter, as previously indicated, Mrs. M. had Christine vaccinated against polio and DPT without her husband’s knowledge.
Christine has not been vaccinated against measles or received any further vaccinations because respondent has forbidden it. Mrs. Amy M. continues to be a member of the Church of God Seventh Day and attends church each week. Mrs. M. wishes Christine to be vaccinated against measles. To do so is not contrary to her religious beliefs. She believes that her husband’s objections are based upon his personal and medical beliefs.
II. DISCUSSION
A. Failure to vaccinate as neglect
Section 1012 (f) of the Family Court Act defines a neglected child as "a child less than eighteen years of age (i) whose physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired as a result of the failure of his parent * * * to exercise a minimum degree of care (A) in supplying the child with adequate * * * medical * * * care, though financially able to do so or offered financial or other reasonable means to do so”. (Emphasis supplied.) Thus, section 1012 (f) (i) (A) establishes a two-prong test for determining neglect. First, the child’s condition must be the result of a failure of her parent to exercise a minimum degree of care. Second, the child’s condition must be "impaired” or "in imminent danger” of becoming so as a result of such parent’s act or omission. Impairment or imminent risk of impairment is therefore a prerequisite to a finding of neglect. (Matter of Faridah W., 180 AD2d 451, 452 [1st Dept 1992], Iv denied 80 NY2d 751 [1992].)
The United States Supreme Court has historically recognized that the right of parents to rear their children in accordance with their personal and religious beliefs must give way when the health or safety of children is threatened or when parental conduct poses some substantial threat to public safety. (Prince v Massachusetts, 321 US 158 [1944], reh denied *11 321 US 804 [1944]; Wisconsin v Yoder, 406 US 205 [1972]; Stanley v Illinois, 405 US 645 [1972]; Jehovah’s Witnesses v King County Hosp., 390 US 598 [1968], reh denied 391 US 961 [1968], affg 278 F Supp 488 [WD Wash 1967]; People v Pierson, 176 NY 201, 210-211 [1903].) Government interference with the right of parents to nurture and to manage their children has been grounded both upon the State’s general police power to protect and promote public welfare, and upon the doctrine of parens patriae. (Santosky v Kramer, 455 US 745, 766 [1982]; Prince v Massachusetts, supra, 321 US, at 166, 169.) Moreover, the United States Supreme Court specifically has recognized that the enactment of statutes requiring immunization against communicable diseases, in the interest of both children and of the general public, is a valid exercise of a State’s police power. (Prince v Massachusetts, 321 US, at 166-167; Jacobson v Massachusetts, 197 US 11 [1905]; Zucht v King, 260 US 174, 176 [1922]; see also, Matter of Fosmire v Nicoleau, 75 NY2d 218, 226 [1990]; Matter of Viemeister, 179 NY 235, 241 [1904].) In Jacobson v Massachusetts (supra), the Supreme Court held that it is within the power of a State to enact a compulsory vaccination law and that it is for the Legislature, and not the courts, to determine in the first instance whether vaccination is the best mode for the prevention of small pox and the protection of public health.
The New York Legislature has enacted section 2164 (2) of the Public Health Law, requiring vaccination against certain communicable childhood diseases. This statute reads in relevant part as follows: "Every person in parental relation to a child in this state shall have administered to such child an adequate dose or doses of an immunizing agent against poliomyelitis, mumps, measles, diphtheria, rubella and haemophilus influenza type b (Hib), which meets the standards approved by the United States public health service for such biological products, and which is approved by the state department of health” (emphasis supplied). Section 2164 (7) of the Public Health Law requires that vaccines be administered to children prior to their admittance to school. Section 2164 (4) provides that the required vaccines may be administered, without cost, by a county health official should parents be unable to afford the services of a private health practitioner.
In amending section 2164 of the Public Health Law in 1968, to specifically require immunization against small pox and measles, the State Legislature made the following findings:
"1. Among the truly great medical advances of this genera *12 tian have been the development of proved methods of reducing the incidence of smallpox and measles, the once great cripplers. Public health statistics show clearly that immunization is effective and safe.
"2. Out of apathy or ignorance, millions of Americans are still not properly immunized. Many millions of the unimmunized are pre-school children under the age of six years. Studies indicate that the majority of these unprotected persons are in the lower socio-economic group who reside in congested urban areas and who are generally apathetic towards immunization. The typical victim is a child less than six years of age in an underprivileged family.
"3. Consequently, the large numbers of pre-school children who are unprotected against small pox and measles must be immunized and protected in their own self-interest as well as for the health and economic well-being of the community.
"4. The legislature therefore finds and declares that preschool children must be adequately immunized against smallpox and measles before being permitted to attend a public, private or parochial school in this state. The state should be prepared to pay for the cost of providing and administering such immunizing dose or doses of prophylatic agent against smallpox and measles which meet the standards approved by the United States public health service for such biological products and which are approved by the state department of health.” (L 1968, ch 1094, § 1.) (Emphasis supplied.)
New York’s mandatory vaccination laws have been upheld against constitutional challenge. (See, Matter of Viemeister, 179 NY 235, 241 [1904], supra; McCartney v Austin, 31 AD2d 370 [3d Dept 1969]; In re Whitmore, 47 NYS2d 143 [Domestic Relations Ct 1944]; Pierce v Board of Educ., 30 Misc 2d 1039 [Sup Ct, Oswego County 1961]; Matter of Elwell, 55 Misc 2d 252, 255-256 [Fam Ct, Dutchess County 1967]; see also, Matter of Sherr v Northport-E. Northport Union Free School Dist., 672 F Supp 81 [ED NY 1987]; Maier v Besser, 73 Misc 2d 241 [Sup Ct, Onondaga County 1972] [holding that church membership is not required to invoke the religious exemption].) The Court of Appeals in Viemeister rejected the argument, also raised by respondent herein, that medical and scientific evidence differs as to the efficacy of and necessity for the required vaccine. The Court noted that "[t]he fact that the belief [as to its effectiveness] is not universal is not controlling, for there is scarcely any belief that is accepted by everyone.” (179 NY, at *13 241.) The United States Supreme Court in Jacobson v Massachusetts (supra), citing Viemeister, in upholding a Massachusetts statute, similarly stated: "[w]e must assume that when the statute in question was passed, the legislature * * * was not unaware of these opposing theories, and was compelled, of necessity, to choose between them.” (197 US, at 30.)
The Family Court, Dutchess County, in Matter of Elwell (supra, 55 Misc 2d, at 256) noted:
"the Legislature, and not the courts, has the power and responsibility to decree whether immunization against poliomyelitis is prudent and the most desirable method of over-all prevention of this dreaded disease in the protection of the public health. The fact that people may differ as to the efficacy and necessity of such immunization, or whether the practice is medically wise or unwise, is not conclusive * * *
"While immunization against poliomyelitis may or may not be a preventative of the disease, the fact is that the common belief of the people of our State, expressed presumably through the edict of our legislative representatives, is that it is.”
Here, the New York State Legislature, in requiring vaccination against measles and small pox, specifically found the vaccines to be "effective and safe.”[5]
By Family Court Act § 1012 (f) (i) (A), the Legislature has clearly imposed upon parents the nondelegable, affirmative duty to provide their children with adequate medical care. (Matter of Hofbauer, 47 NY2d 648, 655 [1979]; cf., People v Pierson, 176 NY 201, 205-207 [1903], supra; Matter of Faridah W., supra, 180 AD2d, at 452.) Adequate medical care is generally that degree of care provided by a prudent, loving parent who is anxious for the well-being of a child. (Matter of Hofbauer, 47 NY2d, at 654-655.) In determining whether a parent has provided a child with adequate medical care courts generally consider, inter alla, the seriousness of the child’s condition and the possibility of a cure (or prevention), the risk associated with the recommended treatment, and whether, if the parents have sought alternative treatment, such treatment is recommended by a physician and not one totally *14 rejected by all reasonable medical authority. (Matter of Hofbauer, 47 NY2d, at 656; Matter of Sampson, 37 AD2d 668, affd 29 NY2d 900; Matter of Faridah W., 108 AD2d, at 452, supra; Matter of Cicero, 101 Misc 2d 699.) Here, however, in enacting Public Health Law § 2164 (2) the Legislature has already made a determination that inoculation, of school age children against, inter alla, measles constitutes sound and necessary medical care. It is clear, therefore, that a parent’s knowing failure to provide such immunization, barring a bona fide religious exemption (Public Health Law § 2164 [9]), can constitute medical neglect within the meaning of the Family Court Act. (See, Besharov, Practice Commentary, McKinney’s Cons Laws of NY, Book 29A, Family Ct Act § 1012, at 251.)
Moreover, a parent’s knowing failure to have a child immunized against measles in the midst of a measles epidemic or outbreak clearly places that child’s physical condition in imminent danger of becoming impaired within the meaning of section 1012 (f) of the Family Court Act. (Compare, Brown v City School Dist., 104 Misc 2d 796 [Sup Ct, Steuben County 1980].) The weight to be accorded conflicting expert testimony is, of course, a matter to be determined by the trier of fact. (Norfleet v New York City Tr. Auth., 124 AD2d 715, 716 [2d Dept 1986], lv denied 69 NY2d 605 [1987]; Furia v Mellucci, 163 AD2d 88, 89 [1st Dept 1990], lv denied 77 NY2d 803 [1991].) In this regard the court gives great weight to the testimony of both Dr. Cooper and Dr. Dawlabani that during the measles outbreak Christine was at imminent risk of contracting the highly contagious measles virus and, therefore, of developing the complications of measles which include pneumonia, encephalitis and SSPE.
B. Respondent’s claimed religiously based exemption
While Public Health Law § 2164 mandates the vaccination of children against measles and other childhood diseases, an exemption is provided for a child whose parent holds a genuine and sincere religious belief against inoculation. Section 2164 (9) of such law states in relevant part: "[t]his section shall not apply to children whose parent, parents, or guardian hold genuine and sincere religious beliefs which are contrary to the practices herein required, and no certificate shall be required as a prerequisite to such children being admitted or received into school or attending school.” As enacted in 1966, the former subdivision (9) of section 2164 provided an exemption for only children whose parents or guardians were "bona *15 fide members of a recognized religious organization whose teachings are contrary to the practices” of inoculation. In Sherr v Northport-E. Northport Union Free School Dist. (supra, 672 F Supp, at 91) this provision was found to be violative of the Establishment Clause and the Free Exercise Clause of the First Amendment in that the religiously based exemption required membership in a "recognized religious organization”. Thereafter, effective January 1, 1990, subdivision (9) of section 2164 was amended to its current form. It is clear, therefore, that a parent need not be a member of an organized religious group opposed to inoculation in order to claim a religious exemption. In order to invoke the exemption a parent must however (1) hold a religious belief against vaccination, as opposed to a belief founded upon medical or purely moral considerations; and (2) sincerely hold such belief. (Matter of Sherr v Northport-E. Northport Union Free School Dist., 672 F Supp, at 92, 94.)
In Sherr v Northport-E. Northport Union Free School Dist. (supra), the court recognized that defining "religion” or "religious belief’ is an inherently difficult task. It is one which brings government exceedingly close to trespassing upon First Amendment guarantees. In its search for a legal definition of religion, however, the Sherr court noted (672 F Supp, at 92): "the tremendous diversity of the manners in which human beings may perceive of the universe and their place in it may make the task [of defining religion] virtually impossible * * * The Supreme Court, for example, has held that a religion need not necessarily be founded upon a belief in the fundamental premise of a 'God’ as commonly understood in Western theology * * * and has written that 'the test of belief "in a relation to a Supreme Being” is whether a given belief that is sincere and meaningful occupies a place in the life of its possessor parallel to that filled by the orthodox belief in God.’ United States v. Seeger, 380 U.S. 163, 165-66, 85 S.Ct. 850, 854, 13 L.Ed.2d 733 (1965). The Supreme Court and Second Circuit have each declared religion to involve the 'ultimate concerns’ of individuals, see id., 380 U.S. at 187 * * * International Society for Krishna Consciousness, Inc. v. Barber, 650 F.2d 430, 440-41 (2d Cir. 1981), and the Second Circuit has stated that one touchstone of a religion is present where a believer will categorically disregard elementary self-interest rather than transgressing religious tenets, United States v. Allen, 760 F.2d 447, 450 (2d Cir. 1985)”.
The views espoused by respondent Neil M. are religious *16 beliefs. His beliefs are clearly premised upon the existence of a Supreme Being or God. Mr. M. described himself as a Christian and member of the Church of God Seventh Day. He defined Christianity as "the following of teachings of Christ”, and indicated that "if one ought to be Christian, you must recognize that your body is the temple of God.” He stated "God wants us to have a healthy body and a healthy mind” and referred to a dietary code contained in the bible.
However, in order to be afforded an exemption from immunization a parent must not only demonstrate a religious belief contrary to inoculation but must also demonstrate that the espoused belief is genuinely and sincerely held and as such forms the basis for the objection to vaccination. In other words, even if the espoused belief accurately reflects a parent’s ultimate conclusion about the advisability of inoculation, the opposition to inoculation nonetheless must "stem from religious convictions and have not merely been framed in terms of religious belief so as to gain the legal remedy desired.” (Matter of Sherr v Northport-E. Northport Union Free School Dist., supra, 672 F Supp, at 94.)
The question in each case as to whether a belief is "truly held” is of course one of fact. (United States v Seeger, 380 US 163, 185 [1965], supra.) Therefore, in determining whether a belief is "truly” or "sincerely” held, the trial court must rely heavily upon its unique ability to observe the demeanor of witnesses and to weigh their credibility. In this regard the court noted in International Socy. for Krishna Consciousness v Barber (supra): "Sincerity analysis seeks to determine the subjective good faith of an adherent * * * The goal, of course, is to protect only those beliefs which are held as a matter of conscience * * * [I]t is frequently difficult to separate this inquiry from a forbidden one involving the verity of the underlying belief * * * an adherent’s belief would not be 'sincere’ if he acts in a manner inconsistent with the belief * * * or if there is evidence that the adherent materially gains by fraudulently hiding secular interests behind a veil of religious doctrine.” (650 F2d 430, 441 [2d Cir 1981].)
Also instructive is Lewis v Sobol (710 F Supp 506 [SD NY 1989]) in which the court found that parents’ beliefs were sincerely held. In Lewis the parents instituted the action against the State Commissioner of Education and Superintendent of the Yonkers School District and others to enjoin them from excluding their daughter from kindergarten. At trial plaintiffs were the primary witnesses, testifying extensively *17 about the development of their beliefs. The plaintiffs had lived in a multitribal American Indian spiritual community during which time their daughter was born without the assistance of a doctor. The wife testified that she had given "a great deal of thought as to how I would treat my body so that it would be as effective a physical vehicle for my spirit to come through” (supra, at 508). The parents’ beliefs with respect to nutrition and medicine, developed at the community, governed their and their daughter’s lives. They indicated that they did not believe in preventive medicine but that they saw medical intervention as required only when illness occurs and that then they treated the spirit as well.
In Lewis (supra) the court rejected the school district’s contention that plaintiff’s views were not religious since in having their daughter vaccinated against polio they had not "categorically 'disregarded] elementary self-interest * * * in preference to transgressing [the] tenets’ [of their religious views].” (See, International Socy. for Krishna Consciousness v Barber, supra, 650 F2d, at 440.) However, the testimony before the court from both plaintiffs and the paternal grandmother was that the latter had embarked upon a vigorous campaign to pressure, and finally succeeded in pressuring, plaintiff mother to have the child vaccinated without plaintiff father’s consent. The court in Lewis (110 F Supp, at 514) concluded that plaintiffs’ beliefs were sincerely held, noting that their "belief in a creator and in maintaining spiritual perfection pervades their life, especially their diet and methods for treating illness” and that the testimony of plaintiff mother was "sincere, direct and very credible.”
However, in Sherr (supra), the court found that plaintiffs Alan and Claudia Sherr’s views were religious but were not sincerely held and that, therefore, they did not merit an exemption under section 2164 (9). The Sherrs had previously requested of the school board an exemption from the immunization requirement based upon their membership in a health organization which rejects the theory and use of inoculation, under any circumstances as a matter of science, safety and conscious. (672 F Supp, at 94.) Also, Paul Sherr admitted that he had joined a religious organization solely for the purpose of obtaining an exemption for his son and that he had paraphrased a statement of religious belief used by a successful plaintiff in another case. (672 F Supp, at 96.)
The Sherr court did conclude that another set of plaintiffs in that case, Louis and Valery Levy, had manifested "complete *18 sincerity” in their religious beliefs and were therefore entitled to an exemption. The court noted that the "Levy’s conception of human existence and the physical world seems to pervade their whole way of life, including their eating habits and methods of combatting illness” (672 F Supp, at 96). It was a fundamental tenet of the Levy’s religion, for instance, that " 'the integrity of the body be maintained’ since 'our bodies are the temple of our being’ ” (at 97). Moreover, the Sherr court noted "Louis Levy, moreover, greatly impressed the Court with the seriousness with which he has contemplated the foundations of his religious beliefs and their implications for his family’s daily life”. (672 F Supp, at 97.)
In Mason v General Brown Cent. School Dist. (851 F2d 47 [2d Cir 1988]) the court rejected parents’ claim of a sincerely held religious based objection under former section 2164 (9). In Mason the parents believed that the human body possessed the means of healing itself without medical intervention and that, therefore, inoculation was unnecessary as contrary to the genetic blueprint intended by nature. They also believed that interference with natural neurological and physical functions results in decreased physical functions and increased disease. The father apparently developed these beliefs while attending chiropractic school and subsequently joined the Universal Life Church organized by, and consisting mostly of, fellow chiropractors. The Church operated through mail-order ministry, had no worship or services and no traditional doctrine. Instead, it advocated a "natural existence” with each member determining "the most effective means of expressing his/her life.” (851 F2d, at 49.) The court found that the parents’ belief, taken on its own merit, simply embodied secular chiropractic ethics. At trial Dr. Mason expressed his "fear of the possible side effects from immunization in medical terms, agreeing that, to a large extent, his position was based on scientific evidence and personal theory.” (851 F2d, at 51.)
A parent was found to have demonstrated a sincerely held religious belief in Brown v City School Dist. (supra, 104 Misc 2d 796 [Sup Ct, Steuben County 1980], affd 83 AD2d 755 [4th Dept 1981]). The parent testified that he received his religious training from his parents and that the bible was the cornerstone of this training. He used the bible regularly in the religious instruction of his children. He and his family gathered regularly to discuss the bible, their religion and way of life. He viewed the bible as God’s message and believed that man was born with natural immunity. He believed that *19 immunization would prevent him from obtaining the hereafter and cited the bible in support. He vigorously opposed the ingestion of all drugs. He never received immunization himself and believed that his parents also were never immunized for religious reasons.
In this case the court finds that while respondent Neil M. has articulated religious beliefs contrary to vaccination, he has failed to demonstrate that his opposition to inoculation stems from a sincerely held religious conviction and has not merely been framed in terms of religious belief in order to gain the exemption required.
Mr. M. acknowledged that the Church of God Seventh Day has no teachings which are opposed to vaccination. He converted from Catholicism in 1973. He admitted that before going to Guyana in 1977, where he worked for two years as a missionary for the Church, he was revaccinated. He further admitted that his three oldest children were vaccinated, following their births, with his consent. Significantly, Mrs. M. who continues to be an active member of the Church of God Seventh Day does not oppose vaccination. While respondent argues that his wife was coerced into having Christine immunized for fear that the child would be taken from them, this is belied by the clear and direct testimony of Mrs. M. that she does not share her husband’s opposition to vaccines and that she wishes to have Christine vaccinated because she is concerned about the child contracting the disease. Unlike Lewis (supra), coercion was not established
Unlike the parents in Brown (supra), and the Levys in Sherr (supra), respondent is not opposed to all medication. In fact he admitted that he had Joel treated by an allergist and Amanda treated with penicillin for an infection. Respondent attempts to explain his current objection to Christine being vaccinated as the result of the evolution of his religious and spiritual development. However, unlike the Levys in Sherr, the respondent failed to impress the court as one who had seriously contemplated the foundations of his religious beliefs as they relate to his opposition to inoculation. The respondent referred to, as a basis for his religious-based objection, unidentified scriptures indicating that “God wants us to have a healthy body and a healthy mind.” It was not until cross-examination that he mentioned the dietary code in Leviticus, upon which he did not expound. Like the Levys in Sherr, respondent stated that as a Christian your body is the “temple of God”. Similar to the parents in Lewis (supra), respondent *20 also described his body as "a vehicle” which Christ can use. Nonetheless, the thrust of respondent’s testimony related to his belief that vaccinations were both medically and scientifically unnecessary and unsafe. He attributed allergies, headaches and other health problems suffered by his three older children to their having been vaccinated as infants.
Respondent stated that he is a believer in well health care, or holistic health care, that he and his children need to live healthy, eat well, and practice good sanitation and hygiene. When asked what steps he had taken to ensure the health of his family the respondent stated: "I have always been interested in the health of my children. At a certain point in my life I became very convicted that there is the necessity to do more than simply whenever there is a problem, a health problem to just stick the children in the hands of the doctor and let the doctor do the rest. I became convicted that I ought to become knowledgeable * * * thought that if there were people living longer, if they’re people seeing relationships between food and disease that I ought to start looking into these things * * * I began to read and study and listen to people who had something to say on the issue and it was a very enlightening experience.” The respondent testified, by name, as to numerous medical books and journal articles he had read concerning the lack of need for and the dangers of vaccines. Thereafter, when asked what was his position regarding vaccination respondent stated: "If I were to do so, I would be going against all that I know in my heart. All that I believe. All that I believe. All that I understand to do so would be against everything that I am, it would be against my beliefs, my religious beliefs.” The reference to religion in this response appears to have been an afterthought. Also illustrative is respondent’s testimony concerning a conversation with caseworker Stephan Burch in August of 1990. "It was a lengthy talk * * * I explained to him that it was not out of neglect that I did not want the child immunized it was out of the conviction that that was not the thing to do to have the child healthy. I explained to him that I had done studies * * * I pondered it well each of the legal issues concerning it * * * I had gotten a copy of the law concerning vaccinations. I showed him these things. I showed him a copy of the graph concerning immunizations when it was introduced and * * * how the diseases were going down and subsiding.” Respondent testified further regarding a meet ing with Dr. Dawlabani arranged by Mr. Burch. "I explained *21 to him why I had not vaccinated the child. I explained to him that it was against my religious belief. I also asked him if the problems * * * with vaccinations would stop * * * the child from getting measles. I also asked him * * * why was that [that] in other countries in Europe did not receive vaccinations and diseases subsided. I also asked him whether it was mandatory that I vaccinate the child * * * I told him I had things, literature that * * * there was diseases in the population that was vaccinated was he willing to read these things.”
Mr. M. admitted that his decision not to have Christine vaccinated was influenced by Ms. Sharon Kimmelman, a member of an organization opposed to vaccinations on medical and scientific grounds, and that Ms. Kimmelman had recommended literature which he read. Ms. Kimmelman, who described herself as respondent’s advisor, was present in the courtroom during the proceedings. Also significant is that the two expert witnesses called to testify in respondent’s behalf were a biochemist and medical doctor both of whom voiced opposition to vaccinations on scientific grounds. Most telling, however, is the testimony of Mrs. M. She described her husband’s opposition to Christine being immunized as being based upon his "personal” and "medical beliefs”. She stated that her husband’s concerns were "merely for health reasons” "[a]s far as I am aware of.”
Finally, the court gives great weight to its observation of the demeanor and apparent forthrightness, or lack thereof, of witnesses. (See, Lewis v Sobol, supra, 710 F Supp, at 514 [mother’s testimony found to be "sincere, direct and very credible”]; Matter of Sherr v Northport-E. Northport Union Free School Dist., supra, 672 F Supp, at 96-97 [the Levys manifested "complete sincerity”].) The respondent herein attempts to frame his objection to vaccination in terms of religious beliefs. However, the court concludes that the respondent’s sincerely held objections to the measles vaccine are rooted in his medical and scientific concerns and not religious convictions.
III. CONCLUSION
Accordingly, respondent’s failure to have Christine vaccinated against measles in the midst of a measles outbreak or epidemic caused Christine to be a "neglected child” within the meaning of section 1012 (f) of the Family Court Act. The *22 court’s use of the term "neglected” is limited to the legal definition of that term and in no way suggests that the respondent Neil M. has failed in his parental duty to his daughter in any other respect. (See, Matter of Sampson, 37 AD2d 668, 669 [3d Dept 1971], affd 29 NY2d 900 [1972], supra; Matter of Gregory S., 85 Misc 2d 846, 848 [Fam Ct, Kings County 1976].) To the contrary, Mr. M. impressed the court as a diligent, loving and concerned parent.
The question which remains is whether at this time — when New York City is no longer experiencing a measles outbreak or epidemic — the court should exercise its discretionary power to direct that Christine be vaccinated against measles. (Family Ct Act §§ 233, 1027 [c]; Matter of Vasko, 238 App Div 128 [2d Dept 1933].)
Section 2164 of the Public Health Law requires that children be immunized against poliomyelitis, mumps, measles, diphtheria and rubella prior to admittance to school. Full-time attendance at school is compulsory from the beginning of the school year in which a child reaches six years of age until the end of the school year in which the child reaches 16 years of age. (Education Law § 3205 [1] [c], L 1992, ch 198, eff July 1, 1992.) Christine is now four years of age.
While clearly some risk exists that Christine will contract measles, the urgency previously created by the epidemic or outbreak does not exist. In the absence of other evidence of neglect — medical, emotional or educational — this court declines to utilize its discretionary power to order inoculation at this time. The evidence reflects that Christine and her siblings are well cared for. As previously indicated, both Mr. and Mrs. M. impressed the court as capable and loving parents. Because it is determined that the aid of the court is not required, upon the record now before it, the petition is dismissed. (Family Ct Act § 1051 [c].)
[Portions of opinion omitted for purposes of publication.]

. 40 Centers For Disease Control, Morbidity and Mortality Weekly Report, 305-306 (May 1991); 10 New York City Health Information (May 1991).

. For a discussion of the clinical manifestations of measles see Markowitz & Orenstein, Measles Vaccines, 37 Pediatric Clinic Of North America 604-606 (1990).

. Measles virus was first developed in 1954. The strain of virus was known as the Edmonston strain. Two vaccines developed from this strain were licensed for use in the United States in 1963. One, the Edmonston B strain, was determined to have a high rate of reactions, including fever rash and catarrhal symptoms. The second, KMV (Killed Measles Vaccine), was found to provide short-lived immunity and its use was discontinued in 1967.
Two "further attenuated” live measles vaccines were derived from the Edmonston strain, the Schwartz strain developed in 1965 and the Moraten strain developed in 1968. These vaccines were associated with fewer side effects than the Edmonston B vaccine. Since 1976, the Moraten vaccine has been the only measles vaccine used in the United States.
A trivalent vaccine containing the Moraten vaccine and mumps and rubella vaccines was licensed in 1971. Most measles vaccine in the United States is administered as this trivalent vaccine preparation. (Markowitz & Orenstein, op. cit, at 610-611.)

. The side effects of the measles vaccine are generally mild. Fever of 103 degrees Fahrenheit or higher and transient rash occur in 5 to 15% of vaccine recipients. They usually occur between the fifth and 12th day after vaccinations and last one or two days. One case of encephalitis per million doses of measles vaccine administered have been reported among cases of encephalitis reported within 30 days after vaccination. This rate is similar to that of reported encephalitis of unknown etiology seen in a comparable period in the general population in the same age group. Epidemiologic data has not suggested any relationship between measles vaccine and SSPE. (Markowitz & Orenstein, op. cit., at 616.)

. While New York Public Health Law § 2164 was amended in 1968 to include the requirement of measles vaccination, subsequent amendments to the statute were made in 1970, 1971, 1972, 1975, 1976, 1978, 1979, 1981, 1989 and 1990. Significantly, the Legislature has not removed the requirement that preschool age children be vaccinated against measles.